**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ECOLOGICAL RIGHTS FOUNDATION,

    *Plaintiff,*

    v.         Civ. A. No. 19-0980 (BAH)

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,


    *Defendant.*

## DECLARATION OF ELIZABETH WHITE

I, ELIZABETH WHITE, declare that the following statements are true and correct to the best of my knowledge and are based on my own personal knowledge, on information contained in the records of the United States Environmental Protection Agency (EPA or Agency), or on information supplied to me by employees under my supervision or employees in other EPA offices.

### I. Background/Experience

1. I am the Director of the Office of Executive Secretariat (OEX) within the Office of the Administrator of the EPA. I have held this position since September 2017. My office oversees Freedom of Information Act (FOIA) request processing in the Office of the Administrator; manages the records management program for the Office of the Administrator; manages the Administrator's and Deputy Administrator's executive correspondence; and administers the EPA's Correspondence Management System.

2. I have read and am personally familiar with the Freedom of Information Act (FOIA) request EPA-HQ-2018-011071 submitted by Ecological Rights Foundation (EcoRights) that is the FOIA request at issue in the above-captioned matter. As the director of OEX, I supervise staff in the office responsible for responding to the request. This Declaration describes the process EPA followed in responding to the request at issue and explains EPA's rationale for withholding responsive records processed by my office in full, or in part, pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). The documents withheld in full, or in part, are identified in EPA's *Vaughn* Index, which explains the basis for withholding each record. I make this Declaration in support of EPA's Motion for Summary Judgment.

1

**II. FOIA Request EPA-HQ-2018-011071 and EPA's Search for Responsive Records**

FOIA REQUEST EPA-HQ-2018-011071

3.  On or about August 30, 2018, EcoRights submitted a ten-part, multiple subpart FOIA request using EPA's FOIAonline[1] website, seeking records held by EPA related to several topics (Exhibit A). Broadly described, EcoRights' FOIA request seeks records pertaining to: whether certain Agency policies, practices, and procedures have changed since July 5, 2018, including those related to the Administrator's calendar, those related to engagement with the media, those related to travel for senior EPA leadership, those related to processing FOIA requests, and those related to the provision of security to the Administrator; EPA Office of Inspector General investigations of former Administrator Pruitt; current Administrator Andrew Wheeler's calendar and calendar attachments since July 5, 2018; and the processing of a separate FOIA request Plaintiff submitted to EPA that is currently in litigation in the Federal District Court for the Northern District of California. Ex. A at 1-4. EPA assigned the FOIA request tracking number EPA-HQ-2018-011071.

4.  On August 30, 2018, EPA's National FOIA Office assigned the request to the Office of Executive Secretariat (OEX), Office of the Administrator.

INITIAL RESPONSE AND INITIAL PRODUCTIONS

5.  On December 11, 2018, an attorney from OEX sent EcoRights an email explaining that EPA was working to fulfill its FOIA request. The attorney explained that the Agency was processing a large volume of FOIA requests and doing its best to respond to each request as quickly as possible. The attorney thanked EcoRights for its patience and stated that EcoRights should contact him directly with any questions, comments or concerns (Exhibit B).

6.  On March 15, 2019, the attorney from OEX provided EcoRights with an initial production of records that included Administrator Wheeler's calendars from July 5, 2018 through August 31, 2018. That same day, EcoRights sent an email to the attorney requesting a telephone call and asking that the Agency respond to four questions generally concerning the status of its FOIA request (Exhibit C). Around this time, I began reaching out to subject matter experts in some of the relevant program offices to begin searching for potentially responsive non-calendar records.

---

[1] FOIAonline is the Agency's online FOIA tracking system which the Agency uses to receive and respond to FOIA requests, including to communicate with requesters and to publicly post records released under FOIA.

2

7.  On March 20, 2019, the attorney from OEX responded to EcoRights' email and explained that he was working on EcoRights' request and would respond shortly. Later that day, the attorney sent a second email to EcoRights explaining that he would have a substantive response to EcoRights' March 15, 2019 email by the following day (Exhibit D).

8.  On March 21, 2019, the attorney from OEX sent an email to EcoRights that provided a status update for each of the ten parts of EcoRights' FOIA request. The email also responded to the four questions that EcoRights raised in its March 15, 2019 email (Exhibit E).

9.  On March 22, 2019, EcoRights responded to the Agency's email with a list of six questions and comments (Exhibit F).

10. On March 26, 2019, the attorney from OEX responded to EcoRights and explained that he was still evaluating EcoRights' March 22 email. The attorney also provided EcoRights with a link to a publicly available record that was responsive to a part of EcoRights' FOIA request (Exhibit G).

11. On March 28, 2019, EcoRights responded to the attorney's March 26, 2019 email and, generally, expressed concerns about the status of its FOIA request (Exhibit H).

12. On March 29, 2019, the Agency produced Administrator Wheeler's calendars from September 1, 2018 through December 21, 2018 (Exhibit I).

13. On April 8, 2019, EcoRights filed a complaint alleging that EPA had failed to respond to FOIA request EPA-HQ-2018-011071. EcoRights filed an amended complaint on April 15, 2019.

PLAINTIFF'S PROPOSED ALTERNATIVE SEARCH STRATEGY AND EPA'S
SUBSEQUENT SEARCH FOR RECORDS

14. On June 26, 2019, EPA Office of General Counsel (OGC) staff submitted multiple Boolean search requests to EPA's eDiscovery Service team to search for Microsoft Outlook records dated from July 5, 2018 to June 26, 2019. The search requests covered all parts of EcoRights' FOIA request except those portions related to the EPA Office of Inspector General (OIG) and the calendar searches that were already in progress.

15. EPA OIG conducts its own FOIA search efforts separate from other Agency offices. In this case, OIG searched for records responsive to Part 7 of the FOIA request, the only part of EcoRights' request that sought OIG-related records. Part 7 of the FOIA request sought, in relevant part, "All documents created by EPA since July 5, 2018 constituting,

3

memorializing, describing, or commenting upon the EPA Inspector General's Office's investigations of former Administrator Pruitt, including documents related to whether the investigations are closed or continuing, any results from the investigations, and any disciplinary action planned or taken against former Administrator Pruitt."

16. On July 15, 2019, EPA issued an interim production of records to EcoRights. This production consisted of 38 pages of responsive records collected by OIG.

17. On July 18, 2019, EPA's eDiscovery Service team returned the search results. EPA OGC staff reviewed the eDiscovery collection and identified a total of over approximately 212,000 pages of potentially responsive records. On July 31, 2019, the Agency informed EcoRights that it could process approximately 500 records per month and expected to complete processing the FOIA request within 36 months.

18. On August 8, 2019, EcoRights emailed EPA and proposed an alternative search strategy (Exhibit J). In this message, EcoRights provided clarification for portions of its request and proposed that the search be conducted by providing the clarified request language to management-level staff and subject matter experts who could determine, with input from staff when appropriate, whether responsive records exist, and if so, how to collect them.

19. On August 12, 2019, EPA informed Plaintiff that the Agency would implement the alternative search strategy proposed by EcoRights. This agreement is memorialized in the parties' August 14, 2019 Joint Status Report. EPA also requested additional clarification as to several portions of the FOIA request. On August 14, 2019, Plaintiff provided EPA with additional clarification regarding certain portions of their FOIA request (Exhibit K).

20. Additionally, on August 14, 2019, EPA issued an interim production of responsive records to EcoRights. This production consisted of 6 pages of records.

21. EPA staff then conducted searches across relevant program offices for potentially responsive records using the search method proposed by EcoRights. The Agency consulted with subject matter experts across the Agency concerning the various aspects of EcoRights' FOIA request. The Agency consulted with staff in the Office of Public Affairs, the Office of the Chief Financial Officer, the Office of Mission Support, the National FOIA Office, the Office of Enforcement and Compliance Assurance, and other offices. Subject matter experts reviewed the request language and searched for responsive records.

22. EPA issued an interim production of responsive records to EcoRights on November 25, 2019. This production consisted of 241 pages of responsive records, including 19 pages collected by OIG. EPA issued an interim production of responsive records to EcoRights on January 24, 2020. This production consisted of 24 pages of records.

23. The Agency completed production of responsive records on March 25, 2020. This final production consisted of 38 pages of records and a link to the Agency's publicly facing collection of Administrator Wheeler's calendar records.[2] The Agency's final response letter is attached as Exhibit L.

24. On April 23, 2020, EcoRights emailed EPA a letter outlining concerns with EPA's production of responsive records (Exhibit M). Specifically, EcoRights raised concerns with certain of the Agency's withholdings and with attachments to calendar entries, OIG records, and one FOIA Policies and Procedures Memo that were not included in EPA's production.

25. On June 10, 2020, EPA emailed EcoRights a response letter (Exhibit N). The Agency responded to EcoRights' concerns. The Agency produced some previously withheld material and the OIG and FOIA Policy and Procedures Memo attachment records requested by EcoRights in its April 23, 2020 letter. The Agency communicated that it would address concerns regarding Administrator Wheeler's calendar, and attachments to calendar entries, by June 25, 2020.

26. On June 18, 2020, EcoRights emailed EPA a letter identifying EcoRights' four remaining issues concerning the non-calendar records at issue in this case (Exhibit O).

27. In the course of responding to issues raised in EcoRights' April 23, 2020 letter, the Agency conducted a search for attachments to Administrator Wheeler's calendar using E-discovery tools. The search returned over 200 potentially responsive records. EPA sought additional time to process these calendar attachments and to respond to EcoRights' calendar-related concerns, to which EcoRights consented. This is memorialized in the Agency's unopposed June 22, 2020 motion to modify the briefing schedule and the Court's June 23, 2020 Minute Order.

28. On July 10, 2020, the Agency made a production of records. The production also included updated versions of Administrator Wheeler's calendar as the Agency made some discretionary releases or otherwise produced previously withheld information. For ease of reference, with its July 10, 2020 production, the Agency provided to EcoRights an index outlining EPA's responses to the issues EcoRights had raised. The Agency also produced attachments to the Administrator's calendar. The Agency's production letter is attached as Exhibit P.

---

[2] Administrator Wheeler's calendars are a frequently requested collection of records. As such, the Agency has compiled the records – starting with April 2018, when Mr. Wheeler began working at EPA as the Deputy Administrator – and placed them on EPA's website for public viewing. If the Agency receives a FOIA request for a portion of the Administrator's publicly available calendar, the Agency's practice is to refer those requesters to EPA's website.

29. On July 23, 2020, EcoRights emailed EPA a letter that outlined certain concerns with the Agency's July 10 production (Exhibit Q). EcoRights' concerns included, Exemption 5 withholdings, Exemption 6 withholdings, responsiveness of certain records, and Personnel Security Detail information. EcoRights clarified that it did not intend to challenge withholdings associated with records produced by OIG. On that same date, the parties agreed to a 14-day extension of the briefing schedule. This agreement was memorialized in the Agency's unopposed July 27, 2020 motion to modify the briefing schedule and the Court's July 28, 2020 Minute Order.

30. On August 3, 2020, EPA emailed EcoRights a letter and responded to certain of the concerns that Plaintiff raised in its July 23, 2020 letter (Exhibit R). The Agency also explained that it was continuing to review some of Plaintiff's other concerns. On August 11, 2020 the Agency emailed EcoRights an additional letter clarifying that any records pre-dating July 5, 2018 were outside the scope of the FOIA request and would not be addressed by the Agency in its forthcoming Motion for Summary Judgment filing (Exhibit S). The Agency noted that the relevant portion of Plaintiff's FOIA request sought: [a]ll documents created by EPA constituting or memorializing Acting Administrator Andrew Wheeler's full calendar, meeting schedule, and notes from meetings from July 5, 2018 to the present."

31. On August 14, 2020, EPA made an additional production of records (see Exhibit T, production letter). The production included portions of Administrator Wheeler's calendar and attachments to calendar entries where the Agency revised certain withholdings and, in some cases, issued discretionary releases of information.

32. On August 17, 2020, EcoRights emailed EPA to clarify that it was not challenging the Agency's withholding of several records. On that same day, EPA made an additional production of records to EcoRights. The production included calendar entries and calendar attachments.

33. In summary, after EPA agreed to implement EcoRights' alternative search strategy, the Agency made eight productions of records. The Agency has withheld certain information pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E).

**III. Responsiveness and Search Issues**

34. I understand that EcoRights has raised concerns with two aspects of the Agency's search for records: the redaction of non-responsive records that fell outside of Plaintiff's request for the Administrator's calendar, and the Agency's determination that drafts of a November 2018 Awareness Notification Memorandum are not responsive to this request.

6

## NON-RESPONSIVE CALENDAR RECORDS

35. FOIA request EPA-HQ-2018-011071 sought in part, "All documents created by EPA constituting or memorializing Acting Administrator Andrew Wheeler's full calendar, meeting schedule, and notes from meetings from July 5, 2018 to the present."

36. In order to produce the Outlook calendar in response to the FOIA request, EPA converted the calendar from an Outlook format to a PDF format. To complete the conversion, an employee emailed themselves the Outlook calendar, and then converted that email attachment to PDF. The resultant PDF contained the calendar records, as well as headers with the name of the employee who generated the calendar and the subject line of the email and footers of the employee's name and signature block. The headers and footers that resulted from the conversion are separate records which are not responsive to the FOIA request and have therefore been redacted.

37. The redactions on pages 1 and 91 of the January 2019 calendar, pages 1 and 89 of the February 2019 calendar, and pages 1 and 132 of the March 2019 calendar are redactions of separate non-responsive records that are not a part of the calendar records sought by this FOIA request. The non-responsive record redactions are to the headers and footers that resulted from the conversion of the calendar from an Outlook format to a PDF format, as described above. That header includes the subject line of the email and the name of the employee who generated Administrator Wheeler's calendar for the FOIA production. The footer includes the name and signature block of the employee who generated the calendar for the FOIA production. The Administrator's calendar in Outlook does not include the information withheld in the headers and footers; this information occurred solely as the result of the conversion from an Outlook format to a PDF format, as described above.

## DRAFTS OF THE NOVEMBER 2018 AWARENESS NOTIFICATION MEMORANDUM

38. FOIA request EPA-HQ-2018-011071 sought in part, "All documents created by EPA since July 5, 2018 constituting or memorializing any instructions, directive, plan, policy, practice, or memorandum to EPA staff concerning how to review and/or respond to Freedom of Information Act ("FOIA") requests." One of the records that the Agency produced in response to this portion of the request is a November 16, 2018 memorandum issued by then Chief of Staff Ryan Jackson concerning the Agency's Awareness Notification process (Awareness Notification Memorandum). In EcoRights' April 23, 2020 letter (Exhibit M), it stated that, "[t]here are no drafts of the single record provided in this production. It is not plausible that this statement went directly to its final version."

39. The Agency did not collect drafts of the Awareness Notification Memorandum as part of its response to this FOIA request because the request sought any "instructions, directive, plan, policy, practice, or memorandum to EPA staff concerning how to review and/or

7

respond to Freedom of Information Act ("FOIA") requests." Any draft versions of the Awareness Notification Memorandum were not circulated to EPA staff as an instruction, directive, plan, policy, practice or memorandum, and therefore were not collected in response to this portion of the request.

## IV. Withholdings

40. I understand that EcoRights is challenging EPA's withholding of certain information pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). The records at issue are certain entries in Administrator Wheeler's Calendar, 19 attachments to Administrator Wheeler's Calendar, and a single non-calendar record titled "ORD Response to OW Phase 2 request DRAFT 03-07-17."

<u>ADMINISTRATOR WHEELER'S CALENDAR ENTRIES</u>

41. The Agency produced Andrew Wheeler's calendar from July 5, 2018, through the month of search, March 31, 2019. EcoRights has indicated that they are challenging withholdings of certain portions of these calendars. The Agency's withholdings are described in detail in the Agency's attached *Vaughn* Index. The calendar entry withholdings fall into five general categories: Personal Matters, Personnel Security Detail Agent (PSD) Names and Contact Information and Security Information, information related to Job Candidates, the specific locations of meetings at the White House, and certain information subject to the deliberative process privilege.

*Personal Matters*

42. The Agency is withholding portions of calendar entries that reflect information that carries a significant privacy interest and minimal, if any, public interest. Information reflecting personal matters that is withheld pursuant to Exemption 6 includes the locations at which the Administrator ate lunch or dinner, hotel locations at which the Administrator stayed, details concerning the Administrator's specific travel arrangements, personal and family events that are reflected on the calendar, and personal phone calls or meetings.  The *Vaughn* Index directly addresses each Exemption 6 withholding involving a personal calendar entry.

43.  For example, EPA withheld portions of calendar entries related to the locations where Administrator Wheeler had lunch or dinner on a given day. Calendar entries related to where the Administrator had lunch or dinner constitute personnel and "similar" files because the information applies to and is identified with a particular individual, Administrator Wheeler, and is personal in nature. Administrator Wheeler has a strong privacy interest in the not disclosing where he eats lunch or dinner. There is a privacy interest in not having one's dietary preferences published and disclosure of this information could expose Administrator Wheeler to harassment during future visits to these restaurants. In contrast, there is no public interest in knowing what dining

establishment Administrator Wheeler went to for lunch or dinner on a given day. Where Administrator Wheeler ate lunch or dinner does not shed light on EPA's performance of statutory duties. In this instance, the harm to Administrator Wheeler as a result of disclosure clearly outweighs the absence of public interest in disclosure.

*Personnel Security Detail Agent Names and Contact Information*

44. The Criminal Investigation Special Agents who provide protection to the Administrator as needed are referred to as Personnel Security Detail (PSD) agents. Where PSD agent names and email addresses appear on the calendar, this information is withheld pursuant to Exemptions 6 and 7(C). The calendar entries constitute personnel and "similar" files because the information applies to and is identified with particular individuals. Further, the purpose of the PSD is to ensure the Administrator's security by detecting, preventing, and responding to potential criminal acts perpetrated against him. PSD protection of the Administrator is a law enforcement purpose therefore calendar entries which contain PSD information were compiled for law enforcement purposes.

45. The PSD agents have a significant privacy interest in the continued withholding of their names and email addresses. Disclosure of their identities, including contact information, could expose them to harassment or danger due to their role providing security to the Administrator. The identity of the PSD agents that protected the Administrator on a particular day or time does not shed light on EPA's performance of statutory duties. Therefore, disclosure of the information would constitute a clearly unwarranted invasion of personal privacy.

46. PSD agents are also members of law enforcement, heightening the need to protect their identities. Therefore, their identities should be withheld pursuant to Exemption 7(C) as well as Exemption 6. Disclosure of the identities and email addresses of PSD agents could interfere with their ability to protect the physical safety of the Administrator when on duty. PSD agents have a significant personal privacy interest in remaining free from threats and harassment related to their role in law enforcement. As explained above, there is no public interest in disclosure of the identities of individual PSD agents, or their contact information. Therefore, disclosure of the law enforcement information would constitute a clearly unwarranted invasion of personal privacy.

47. In summary, PSD agent names and contact information is properly withheld pursuant to Exemptions 6 and 7(C).

*Job Candidate Information*

48. There are two instances where information in calendar entries related to prospective job candidates is withheld pursuant to Exemption 6. In the first instance, the name and

9

contact information of a person that the Administrator was scheduled to call to provide a job reference is withheld pursuant to Exemption 6. *See* Monday, November 19, 2018, 3:30-3:45PM. In the second instance, the name and contact information for a prospective candidate for a position at EPA is withheld where the Administrator was scheduled to have a call with that job candidate. The job candidate did not fill the position for which they were being considered. *See* Friday, February 8, 2019, 10:00AM-10:30AM. In each of these cases, disclosure of the withheld information would reveal information about job candidates seeking positions. Where a candidate is not selected for a position, that candidate has a significant privacy interest in the information surrounding their consideration remaining private. Disclosure can result in embarrassment for the candidate or may have an impact on the current employment of the candidate. As the *Vaughn* Index describes, the name and contact information of a person seeking a reference does not shed any light on EPA's performance of its statutory duties.  Similarly, the name of the individual who was being considered for a position at EPA that they did not fill does not shed any light on EPA's performance of its statutory duties. These individuals' significant privacy interest outweighs the lack of any public interest.

*White House Meeting Locations*

49. There are three instances where the specific room within the White House where a regular meeting concerning clean air fuel economy standards took place is withheld pursuant to Exemption 7(E). Due to the high security concerns associated with meetings held at the White House and the law enforcement work required to protect White House staff and visitors, records associated with particular locations within the White House are compiled for law enforcement purposes. Disclosure of regular meeting locations within the White House poses operational challenges for security.  In this instance, disclosure could reasonably be expected to risk circumvention of the law.

*Calendar Entries Subject to the Deliberative Process Privilege*

50. As I understand, Plaintiff is challenging Exemption 5 redactions for three calendar entries. Each of these withholdings is also addressed in EPA's *Vaughn* Index.

51. The first calendar entry is dated July 5, 2018 and concerns proposed improvements to the Agency's management of its laboratory system. At the time the entry was created, ORD staff and management were discussing internally how to possibly improve EPA's overall lab enterprise as part of a Kaizen lab project. The withheld information details parts of that deliberative process including staff recommendations. The withheld information was not circulated outside the EPA. The withheld information is deliberative because EPA staff and management were internally considering how to improve EPA's overall lab enterprise. The withheld information reflects preliminary thoughts about the Kaizen lab project and staff recommendations to senior leaders, including Administrator Wheeler. The content of the entry does not reflect a final decision. Rather, it reflects only the

10

thoughts and considerations of EPA staff engaged in ORD's Kaizen lab project and the briefing of their thoughts and recommendations to Administrator Wheeler and other relevant senior leaders for decision-making. Release of the withheld information would have a chilling effect on the Agency's ability to engage in open and frank discussions concerning making recommendations to EPA senior leadership regarding possible improvements to Agency management of its resources.

52. The second calendar entry is dated July 11, 2018 and contains preparation notes for an upcoming meeting between Administrator Wheeler and Australian Minister Josh Frydenberg. The withheld information is protected by the deliberative process privilege because it reflects pre-decisional deliberations among EPA staff in preparing Administrator Wheeler and other senior leaders for a meeting with Australian Minister Josh Frydenberg. At the time this entry was created, EPA staff and senior leaders were discussing internally how to effectively prepare for the meeting with Minister Frydenberg and were planning a briefing for Administrator Wheeler and other relevant senior leaders. The withheld information details a part of that preparatory process. The withheld information was not circulated outside the EPA. The withheld information is deliberative because EPA staff and management were internally considering how to best prepare Administrator Wheeler and other relevant senior leaders for the meeting with Minister Frydenberg. The withheld information reflects preliminary thoughts about potential topics for discussion, meeting invitees, and draft elements of a briefing package, that were considered as part of the Agency's decision-making process concerning how to prepare for the meeting with Minister Frydenberg. The content of the entry does not reflect a final decision, only the thoughts and considerations of EPA staff engaged in preparing Administrator Wheeler and other relevant senior leaders for the meeting with Minister Frydenberg. The foreseeable harm associated with release of the withheld information is that disclosure would have a chilling effect on the Agency's ability to foster the open and forthright exchange of ideas and advice among its staff necessary to adequately prepare senior leaders for high level meetings with representatives of foreign governments. Release would therefore interfere with Agency decision-making processes related to preparing EPA's senior leaders for participation in these meetings and in advising senior leaders on talking points to consider. Lastly, release of talking points would cause public confusion where the Administrator's remarks did not reflect the opinions and recommendations in the recommended talking points documents used to prepare him for an event or meeting.

53. The third calendar entry that contains material withheld pursuant to the deliberative process privilege is dated December 3, 2018 and consists of a draft agenda for Cabinet members' participation in the Arrival Ceremony and Lying in State in the Capitol Rotunda for former President George H.W. Bush. The withheld information is protected by the deliberative process privilege because it reflects pre-decisional deliberations among federal government staff concerning the tentative schedule and plans for Cabinet members to participate in the arrival ceremony and lying in state in the Capitol Rotunda

for former President George H.W. Bush. The withheld information is deliberative because federal government staff were discussing logistics, including a draft schedule, and plans for attendance. The withheld information reflects preliminary thoughts and plans that were considered as part of the decision-making process for scheduling and preparing for the ceremony. The content of this entry does not reflect a final decision, only the thoughts and considerations of staff engaged in the scheduling and planning of the solemn event. The information was not circulated outside the federal government. The foreseeable harm associated with release of the withheld information is that disclosure would have a chilling effect on federal government decision-making processes, and on staff's ability to freely discuss their ideas and thoughts concerning the scheduling and planning of high-profile public government events.

## CALENDAR ATTACHMENTS

54. There are 21 calendar attachment records that contain Exemption 5 withholdings that are at issue. These withholdings are individually discussed in detail in the Agency's *Vaughn* Index. These withholdings fall generally into five categories, described below: Briefing Documents, Suggested Talking Points, Emergency Response, Attorney Communications, and Interagency Coordination.

*Briefing Documents*

55. EPA withheld attachments to calendar entries that were briefing documents prepared to assist the Administrator, and other relevant EPA senior leaders, with making a particular decision or decisions. EPA withheld these documents in whole or in part pursuant to Exemption 5, deliberative process privilege. EPA program/regional staff and managers drafted the withheld records to outline options and/or provide recommendations to senior Agency officials who will participate in the decision-making process or make the relevant decisions. For each of these documents, the *Vaughn* Index entries detail the deliberative process that is involved, and the role played by the withheld material in the course of that process. These documents are inherently pre-decisional because they concern decisions that require action from the Agency's senior leaders. These documents are deliberative because they contain staff-identified options, recommendations, or other information provided to aid senior officials in deciding how to address the particular subject. Each *Vaughn* entry describes the particular harm that would result if the information were to be disclosed. Nevertheless, as a general matter, disclosure of the withheld portions of these briefing documents would harm the Agency's ability to provide candid advice, opinions, and information to senior officials when seeking a decision or guidance on how to address an issue that requires leadership input. The Agency must be able to provide a full spectrum of advice and recommendations to decision-makers, and if staff is concerned that their advice or recommendations will be publicly scrutinized, it will affect their candor and, as a result, the quality of EPA's decision-making. Additionally, disclosure of briefing documents can create public confusion about the relevant Agency decisions by disclosing reasons, rationales, and conclusions that were not in fact ultimately the bases for the Agency's final decisions.

12

56. An example of a briefing document that the Agency has withheld in part is ED_004712_00004639, a document titled, "Final Agenda Edwards Dispute Admin Briefing 11-2-18.docx." The document contains a briefing on options for resolution of a dispute that arose under the Federal Facilities Agreement (FFA) that governs the superfund cleanup at the Edwards Air Force Base South Air Force Research Laboratory (AFRL) site. The Air Force, EPA, Department of Toxic Substances Control (DTSC), and the Lahontan Water Board signed an FFA in 1990 which established the procedural framework and schedule for developing, implementing, and monitoring at the Base in accordance with CERCLA, the NCP, Superfund guidance and policy, and applicable State of California laws. The document is organized into four sections: (1) "Introduction and Review of Meeting Purpose," (2) "Dispute Background and Brief Chronology," (3) "Options for Resolution Discussion," and (4) "Action Items and Path Forward." The "Options for Resolution Discussion" and "Action Items and Path Forward" sections are withheld pursuant to Exemption 5, the deliberative process privilege.

57. EPA staff used document ED_004712_00004639 to brief the Administrator, and other Agency leaders, on a decision regarding a dispute that arose under the FFA. The withheld information is pre-decisional because it was generated prior to arriving at a final decision concerning EPA's actions with regard to resolution of the dispute. At the time, EPA was still deliberating about the best approach to the matter and the withheld information reflects some of the options available to the Agency, as identified by staff working on this issue. The withheld information is deliberative because it reflects options for resolution and the thoughts of staff related to action items and a path forward on this dispute. The information was provided to the Agency's senior leaders to solicit feedback and final decision-making on staff's proposed options. The information does not reflect an official Agency decision or policy, instead it reflects analysis, opinions, and suggestions on actions still in development. The document was used to brief Administrator Wheeler, and other senior leaders, to assist the leaders in making a final decision.

58. The foreseeable harm associated with release of the withheld information is that disclosure would hamper the efficient day-to-day workings of EPA, as staff would no longer feel free to brief issues with candor and provide advice and options to senior level decisionmakers. If the withheld information were released, staff would be more circumspect in providing their views and opinions, which would impair the Agency's ability to foster forthright, internal discussions necessary for efficient and proper decision-making. Furthermore, release could cause public confusion by disclosure of options, rationales, and conclusions that were not in fact ultimately the bases for the Agency's decision how to approach the Edwards South AFRL dispute and the actions that were taken towards resolution.

59. The *Vaughn* Index contains detailed descriptions of the deliberative processes involved in the withheld material for each briefing document at issue. The document ID's of briefing

13

documents are: ED_004712_00004639, ED_004712_00005410, ED_004712_00005438, ED_004712_00017566, ED_004712_00017637, ED_004712_00018087, and ED_004712_00018089.

*Suggested Talking Points*

60. EPA withheld talking points drafted to assist the Administrator with preparation for upcoming events or meetings. Specifically, the withheld material is part of the Agency's deliberative process concerning how to communicate with the public, legislators, officials from other countries, and state partners. EPA staff drafted talking points in various contexts to facilitate the Administrator's decision-making as to what remarks to offer at an event or meeting. The withheld information is pre-decisional because it is communicated in advance of the Administrator's decision on what to communicate at the particular event or meeting. The withheld information is deliberative because it reflects the personal opinions and thoughts of staff working on preparing the Administrator for the event and tasked with providing him with suggested talking points. The information does not reflect an official Agency decision or policy, instead it reflects opinions from staff on what Administrator Wheeler could expect to occur at an event or meeting and suggested talking points that the Administrator could consider during his remarks. Release of talking points would have a chilling effect on the Agency's ability to have open and frank discussions among its staff concerning preparing senior leaders for events, including the drafting of suggested talking points, consequently undermining EPA's ability to effectively communicate key issues with important stakeholders and the public. Further, release of talking points would cause public confusion where the Administrator's remarks did not reflect the opinions and recommendations in the recommended talking points documents used to prepare him for an event or meeting.

61. An example of a talking points document that the Agency has withheld in part is ED_004712_00017961, a two-page memorandum titled "Admin Wheeler Call w Lisa Murkowski 7-12-18.docx." The memorandum is from Christian Palich to Administrator Wheeler, and carbon copies (Cc) Troy Lyons. Christian Palich, a former senior adviser, provided this document to the Administrator to review in order to prepare him for a telephone call with Senator Murkowski. The briefing document is organized into three sections: (1) "Purpose," (2) "Biography," and (3) "Topics for Discussion." The "Topics for Discussion" section is withheld pursuant to Exemption 5 of the deliberative process privilege. The withheld information is pre-decisional because it was generated to brief Administrator Wheeler on the scheduled telephone call, to prepare him for potential topics of discussion, and to provide him with talking points on those potential points of discussion. The withheld information is deliberative because it reflects the personal opinions and thoughts of staff working on preparing Administrator Wheeler for this call with Senator Murkowski. The information does not reflect an official Agency decision or policy, instead it reflects the personal thoughts, opinions and suggestions of staff on how best to communicate Agency issues to the Senator. The briefing document was provided

14

to Administrator Wheeler so that he could review the information, be prepared to discuss the potential topics of discussion that staff outlined and have talking points available should those outlined topics arise during the call. The foreseeable harm associated with release of the withheld information is that disclosure would have a chilling effect on the Agency's ability to foster the open and forthright exchange of ideas and advice among its staff necessary to adequately prepare senior leaders for high level meetings with members of Congress. Release would interfere with Agency decision-making processes related to preparing EPA's senior leaders for participation in meetings with Congressional officials. Lastly, release would cause public confusion by disclosing the opinions of staff related to identifying potential topics of discussion and recommended talking points that staff provided to the Administrator where those opinions and recommendations differ from what was ultimately communicated by the Administrator.

62. The *Vaughn* Index contains detailed descriptions of the deliberative processes involved in the withheld material for each talking points document at issue. The document ID's of talking points documents are: ED_004712_00005385, ED_004712_00017459, ED_004712_00017552, ED_004712_00017727, ED_004712_00017816, ED_004712_00017838, ED_004712_00017919, and ED_004712_00017961.

*Emergency Response*

63. There are three documents related to the Agency's emergency response to Hurricane Florence or Super Typhoon Yutu in which the Agency has withheld either draft management objectives or draft status updates pursuant to Exemption 5, deliberative process privilege. These documents are fully described in the Agency's *Vaughn* Index under the document IDs ED_004712_00018082, ED_004712_00018071, and ED_004712_00018000.

64. As an example, document ED_004712_00018000 which is fully described in the Agency's *Vaughn* Index contains a draft of the Agency's management objectives for EPA's response to Super Typhoon Yutu. The draft management objectives are pre-decisional to the finalized management objectives. The draft management objectives are deliberative because they represent the response team and management's thoughts and recommendations on how best to evaluate the Agency's emergency response going forward. At the time, staff was weighing what goals management should establish for the Agency in responding to the typhoon. The draft language reflects the state of those deliberations at that moment in time. The foreseeable harm from disclosure of the draft management objectives is that disclosure would chill the response team and EPA management's ability to candidly develop high-level goals concerning the Agency's typhoon response efforts. Where team members are not free to openly provide opinions and recommendations, development of the most robust management objectives will be diminished. Additionally, these draft management objectives differ from the final management objectives, therefore disclosure of the draft objectives will result in public confusion concerning management of the Agency's response efforts.

*Interagency Coordination*

65. There is a single agenda attachment that the Agency has withheld pursuant to Exemption 5, deliberative process privilege, document ED_004712_00017471. This agenda is internal to the federal government and was used to prepare for an upcoming meeting with the National Economic Council (NEC) and representatives of several agencies. The agenda contains a list of the topics to be discussed at the upcoming meeting. The withheld material is predecisional because of its role in preparing meeting participants for the decisions to be made at the upcoming meeting. The document is deliberative because it is part of the interagency process of collaborating to solve a number of issues important to the federal government. The NEC's function is to advise the President on U.S. and global economic policy. Materials used to coordinate with agency partners help to support the overall deliberations of the NEC. The foreseeable harm associated with the release of the withheld information is that disclosure would impair the NEC's ability to effectively coordinate with agencies when preparing for meetings involving decision making. Disclosure of this type of record would chill the NEC and federal agencies' ability to candidly develop plans for meetings and facilitate decision-making. Where the NEC and agencies have made decisions that appear to differ from what information is reflected on meeting agendas, then disclosure of the withheld material will create public confusion. Finally, where agenda items represent ongoing decision-making, disclosure of the agenda may prematurely disclose federal decisions.

### "ORD Response to OW Phase 2 request DRAFT 03-07-17."

66. I understand that Plaintiff challenges the Agency's withholding of one non-calendar record, a document titled "ORD Response to OW Phase 2 request DRAFT 03-07-17.

67. This is a four-page draft internal document. The draft document contains a header that reads, "DRAFT 3/7/17." There are footers on every page of the document that read, "Draft – For Internal Deliberations Only." The staff scientists in the Office of Research and Development (ORD) prepared the draft. ORD staff drafted the document as a proposed response to EPA's Office of Water's request for support on certain aspects of Lead and Copper Rule analysis. This draft document was never finalized. This draft document is withheld in its entirety pursuant to Exemption 5, deliberative process privilege. The withheld information is deliberative because it is composed of draft responses to certain Office of Water requests, suggestions for actions, and estimated timelines developed by ORD staff scientists. The information does not reflect an official Agency decision or policy, rather, it reflects deliberations between and among staff in the Offices of Water and the Office of Research and Development. ORD never finalized the document which reflects draft staff analysis of proposed responses to OW and suggestions for support that ORD could provide as part of the Lead and Copper Rule analysis. The foreseeable harm associated with release of the withheld information is that

16

disclosure would have a chilling effect on Agency staff's ability to draft internal scientific documents that contain proposed responses and suggestions for possible actions, including estimated timelines. Staff must be able to openly propose responses to other program office requests and explain suggested actions that could be taken as part of a larger collaborative scientific analysis, so that decision-makers have access to necessary information.  Therefore, release would interfere with Agency decision-making processes related to collaborative engagement across program offices. Lastly, disclosure of a never-finalized draft document risks creating public confusion concerning the Agency's action on the Lead and Copper Rule.

SEGREGABILITY

68. Throughout EPA's processing of the records at issue, all of the information withheld was carefully reviewed to ensure that the Agency has disclosed all reasonably segregable, non-exempt information. EPA has provided supplemental releases of information where possible, including the Agency's June 10, 2020, July 10, 2020, and August 14, 2020 productions (Exhibits N, P, and T, respectively). The remaining withheld information, if released, would reveal the information sought to be protected by the exemptions claimed. Accordingly, there is no additional reasonably segregable information that can be released to EcoRights.

   Pursuant to 28 U.S.C. § 1746, I hereby affirm under penalty of perjury that the forgoing declaration is true and correct.


Executed this 17th day of August, 2020.



_____

Elizabeth White
Director, Office of the Executive Secretariat
Office of the Administrator
U.S. Environmental Protection Agency