## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendant. | Civil Action No. 19-980 (BAH) <br><br> Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Ecological Rights Foundation, "a non-profit, public benefit corporation . . . devoted to furthering the rights of all people to a clean, healthful, and biologically diverse environment," Am. Compl. ¶ 16, ECF No. 7, challenges the response of defendant, the U.S. Environmental Protection Agency ("EPA"), to a ten-part request submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records related to the agency's transparency, personnel, and accountability policies, *see* Compl., Ex. 1, Pl.'s FOIA Request ("FOIA Request"), ECF No. 1-1.  Specifically, plaintiff alleges in two claims that EPA unlawfully withheld records responsive to plaintiff's FOIA Request (Count II), Am. Compl. ¶¶ 60–62 and failed to conduct an adequate search for responsive records (Count III), *id.* ¶¶ 63–65.[1]

---

[1]     In addition to these counts, the Amended Complaint pled that EPA constructively denied plaintiff's FOIA Request by failing to comply with FOIA's deadline mandate, failing to communicate the intended scope of its production, and failing to make responsive records promptly available to plaintiff (Count I), Am. Compl. ¶¶ 55–59, and engaged in a pattern and practice of violating FOIA's response and determination deadlines, failing to disclose responsive records, and failing to conduct a reasonable search for records (Count IV), *id.* ¶¶ 66–70.  The parties presented no argument on these claims in their pending cross-motions for summary judgment.  In response to the Court's order for supplemental briefing addressing these claims, *see* Min. Order (Jan. 19, 2021), the parties instead stipulated to the dismissal of Counts I and IV, *see* Stipulation to Voluntarily Dismiss Without Prejudice Counts I & IV of Pl.'s Am. Compl. at 2, ECF No. 28, which dismissal was granted on January 22, 2021, *see* Min. Order (Jan. 22, 2021).  Counts II and III are thus the only claims still disputed by the parties.

Pending before the Court are the parties' cross-motions for summary judgment. Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 19; Pl.'s Cross-Mot. Summ. J. ("Pl.'s Mot."), ECF No. 20. For the reasons set forth below, both parties' cross-motions are granted in part and denied in part.

# I.     BACKGROUND

Plaintiff's FOIA Request is briefly described below, followed by review of EPA's responses both before and after initiation of this lawsuit.

## A.      The FOIA Request

On August 30, 2018, plaintiff submitted its FOIA Request to EPA. FOIA Request at 1; Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") ¶ 1, ECF No. 19-2; Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 1, ECF No. 20-3. Broadly speaking, the ten-part Request sought records concerning EPA's policies, practices, and procedures related to transparency, personnel, and expenses since the departure of former EPA Administrator Scott Pruitt on July 5, 2018; investigations of former Administrator Pruitt by EPA's Office of Investigator General ("OIG"); then-Administrator Andrew Wheeler's calendar entries and calendar attachments since July 5, 2018; EPA's policies, practices, and procedures for processing FOIA requests; EPA's processing of a separate FOIA request submitted in February 2017 by plaintiff ("2017 Request") that is currently the subject of litigation in the Northern District of California; and EPA's procedures for engaging with the media. FOIA Request at 1–4; Def.'s SMF ¶ 1; Pl.'s SMF ¶ 2; Decl. of Elizabeth White ("White Decl.") ¶ 3, ECF No. 19-3; Decl. of Stuart Wilcox ("Wilcox Decl.") ¶ 3, ECF No. 20-4.

Three features of the FOIA Request underlie the dispute in this litigation. First, the opening sentence of the FOIA Request frames the request as calling for "all documents constituting, memorializing, explaining or commenting upon" the specific topics enumerated in

each of its ten parts.  FOIA Request at 1.  Second, with the exception of documents responsive to its request, in Part 10, for records related to plaintiff's earlier 2017 Request, the FOIA Request sought only documents created by EPA "since July 5, 2018," the date on which Administrator Wheeler took office, *id.* at 1; *see also id.* at 1–3, and, in Part 6, specified that plaintiff sought "[a]ll documents created by EPA constituting or memorializing Acting Administrator Andrew Wheeler's full calendar, meeting schedule, and notes from meetings *from July 5, 2018 to the present*," *id.* at 3 (emphasis added).  Third, the Request, in Part 8, sought "[a]ll documents created by EPA since July 5, 2018 constituting or memorializing any instructions, directive, plan, policy, practice, or memorandum *to EPA staff* concerning how to review and/or respond to Freedom of Information Act ('FOIA') requests."  *Id.* at 3 (emphasis added).

    **B.    Processing of the Request and Procedural History**

    On August 30, 2018, the same day plaintiff submitted its request, EPA's National FOIA Office assigned the FOIA Request to the Office of Executive Secretariat ("OEX"), Office of the Administrator for processing.  White Decl. ¶ 4.  Part 7 of the FOIA Request, seeking "[a]ll documents created by EPA since July 5, 2018 constituting, memorializing, describing, or commenting upon the EPA Inspector General's Office's investigation of former Administrator Pruitt," FOIA Request at 3, was assigned to OIG, which "conducts its own FOIA search efforts," White Decl. ¶ 15.  Nearly three months later, an OEX attorney emailed plaintiff's counsel, indicating that EPA was "working on fulfilling [plaintiff's] request," but "ha[d] received a very high volume of FOIA's, and consequently, we are doing our best to respond to each as quickly as possible."  Wilcox Decl., Ex. 2, Email from Christopher Yarbrough, Att'y-Advisor, OEX, EPA, to Heather Kryczka, Env'tl Advocs. (Dec. 11, 2018, 10:46 AM), ECF No. 20-6; *see also* Pl.'s SMF ¶ 5; Def.'s SMF ¶ 2; Def.'s Resp. Pl.'s Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Resp. SMF") ¶ 5, ECF No. 23-1; White Decl. ¶ 5.

Nearly seven months after submitting the FOIA Request, in March 2019, plaintiff, still having received no determination, estimated completion date, or responsive records, emailed the OEX attorney again and stated that plaintiff "plan[ned] to file a lawsuit . . . in one week unless [the parties] can quickly resolve this dispute."  Wilcox Decl., Ex. 3, Email from Stuart Wilcox, Env'tl Advocs., to Christopher Yarbrough, Att'y-Advisor, OEX, EPA (Mar. 13, 2019, 4:11 PM), ECF No. 20-7; *see also* Pl.'s SMF ¶ 6; Def.'s Resp. SMF ¶ 6.  Two days later, the OEX attorney provided plaintiff with an initial production of records, which consisted of former Administrator Wheeler's calendars from July 5, 2018 to August 31, 2018, with redacted material withheld as exempt from disclosure under 5 U.S.C. §§ 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(F).  Def.'s SMF ¶ 3; Pl.'s SMF ¶ 7; Def.'s Resp. SMF ¶ 7; White Decl. ¶ 6; Wilcox Decl. ¶ 8.  The attorney also requested that the parties confer as to the status and scope of the FOIA Request.  Pl.'s SMF ¶ 7; Def.'s Resp. SMF ¶ 7; Wilcox Decl., Ex. 4, Email from Christopher Yarbrough, Att'y-Advisor, OEX, EPA, to Stuart Wilcox, Env'tl Advocs. (Mar. 15, 2019, 10:02 AM), ECF No. 20-8; White Decl. ¶ 6.  Plaintiff responded on the same day, "requesting that EPA be ready to discuss the scope of the FOIA request substantively, to agree to a production schedule, to provide an estimated completion date, and to provide support for the redactions it had made thus far."  Pl.'s SMF ¶ 8; *see also* Def.'s Resp. SMF ¶ 8; Wilcox Decl., Ex. 5, Email from Stuart Wilcox, Env'tl Advocs., to Christopher Yarbrough, Att'y-Advisor, OEX, EPA (Mar. 15, 2019, 5:15 PM), ECF No. 20-9.  Around this time, the Director of OEX "began reaching out to subject matter experts in some of the relevant program offices to begin searching for potentially responsive non-calendar records."  White Decl. ¶ 6.

Shortly thereafter, the OEX attorney provided plaintiff with a detailed status update as to each of the ten parts of the FOIA Request and responded to some but not all of the issues raised

by plaintiff in its March 2019 email.  White Decl., Ex. E, Email from Christopher Yarbrough, Att'y-Advisor, OEX, EPA, to Stuart Wilcox, Env'tl Advocs. (Mar. 21, 2019, 7:16 PM), ECF No. 19-9; Wilcox Decl., Ex. 9, Email from Christopher Yarbrough, Att'y-Advisor, OEX, EPA, to Stuart Wilcox, Env'tl Advocs. (Mar. 21, 2019, 5:16 PM), ECF No. 20-13; Def.'s SMF ¶ 4; Pl.'s SMF ¶ 9; Def.'s Resp. SMF ¶ 9; White Decl. ¶ 8; Wilcox Decl. ¶ 12.  The parties continued to confer by email and phone, resulting in the production of three additional calendar records, with redactions, under 5 U.S.C. §§ 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(F), and two non-calendar records.  Pl.'s SMF ¶ 10; Def.'s Resp. SMF ¶ 10; Def.'s SMF ¶¶ 5–6; Wilcox Decl. ¶¶ 13–20; White Decl. ¶¶ 8–12.

Throughout this exchange, plaintiff continued to express concerns about the status of EPA's processing of the FOIA Request, EPA's withholdings, and the lack of a firm production schedule.  Pl.'s SMF ¶¶ 11–12; Def.'s Resp. SMF ¶¶ 11–12; White Decl. ¶ 11; Wilcox Decl. ¶¶ 13–20.  Consequently, plaintiff informed EPA that it did not believe further informal negotiations would be helpful "without the backstop of court supervision," but would be willing "to continue negotiating with [EPA] in the context of a filed case."  Wilcox Decl., Ex. 16, Email from Stuart Wilcox, Env'tl Advocs., to Christopher Yarbrough, Att'y-Advisor, OEX, EPA (Apr. 5, 2019, 10:21 AM), ECF No. 20-20; *see also* Pl.'s SMF ¶ 13; Def.'s Resp. SMF ¶ 13.  Three days later, on April 8, 2019, plaintiff initiated the instant suit.  Compl.  Two months later, the Court directed EPA to "produce to Plaintiff an interim production of non-exempt, responsive records" by July 15, 2019, and the parties to "propos[e] a schedule . . . for a final determination, production schedule, and dispositive motions" the same day.  Min. Order (June 7, 2019) (internal quotation marks omitted).

Two weeks before the court-ordered deadline to make an interim production, on June 26, 2019, EPA's Office of General Counsel ("OGC") undertook its first search, based on Boolean search terms, for records responsive to all parts of the FOIA Request except Parts 7 and 8, which had been assigned to OIG and OEX, respectively.  White Decl. ¶ 14.  As reflected in the parties' Joint Status Report, *see* Joint Status Report (July 15, 2019) ¶ 3, ECF No. 12, EPA notified plaintiff that OGC had completed its search and identified more than 212,000 potentially responsive records.  Def.'s SMF ¶ 8; Pl.'s SMF ¶ 16; Def.'s Resp. SMF ¶ 16; White Decl. ¶ 17; Wilcox Decl. ¶ 25.  In addition, EPA indicated that the agency had capacity to process approximately 500 records per month, meaning that processing of the FOIA Request would be completed in thirty-six months.  Def.'s SMF ¶¶ 8–9; Pl.'s SMF ¶ 16; Def.'s Resp. SMF ¶ 16; White Decl. ¶ 17; Wilcox Decl. ¶ 25.

In an effort to expedite processing, plaintiff proposed an alternative search strategy, under which plaintiff would "provide further guidance on the records [it is] looking for and that this guidance be given to management-level staff and/or subject matter experts who will know whether responsive records exist and/or will know who would have that information."  Wilcox Decl., Ex. 19, Attach. to Email from Stuart Wilcox, Env'tl Advocs., to Derek Hammond, Assistant U.S. Att'y ("AUSA"), U.S. Att'y's Off., D.D.C. ("USAO") (Aug. 8, 2019, 2:30 PM) ("Clarification Letter") at 3, ECF No. 20-23; *see also* Def.'s SMF ¶ 10; Pl.'s SMF ¶ 17; Def.'s Resp. SMF ¶ 17; White Decl. ¶ 18; Wilcox Decl. ¶ 26.  Plaintiff suggested that this search be completed within one month and all responsive records be produced within six months.  Clarification Letter at 3.  The parties agreed to adopt plaintiff's proposed approach, as memorialized in the parties' next status report submitted to the Court.  *See* Def.'s SMF ¶ 10; Pl.'s SMF ¶ 18; Def.'s Resp. SMF ¶ 18; Joint Status Report (Aug. 14, 2019) ("Aug. 2019 JSR")

¶ 4, ECF No. 13.  At the parties' suggestion, EPA was allowed several months to complete this process.  *See* Aug. 2019 JSR ¶¶ 5–6; Min. Order (Aug. 15, 2019).

During this period of continued negotiations between the parties, plaintiff clarified portions of the FOIA Request.  Of particular relevance, plaintiff explained that the FOIA Request's Part 8, seeking "[a]ll documents created by EPA since July 5, 2018 constituting or memorializing any instructions, directive, plan, policy, practice, or memorandum to EPA staff concerning how to review and/or respond to Freedom of Information Act ('FOIA') requests," FOIA Request at 3, "would include any draft and/or final EPA regulations implementing FOIA and any records related thereto," Clarification Letter at 6 (emphasis omitted); *see also* Wilcox Decl., Ex. 20, Email from Stuart Wilcox, Env'tl Advocs., to Derek Hammond, AUSA, USAO (Aug. 14, 2019, 10:26 AM) ("Clarification Email"), ECF No. 20-24 (plaintiff reiterating that Part 8 encompassed draft materials because "[u]npublished internal drafts would of course necessarily be circulated to and/or written by EPA staff"); White Decl., Ex. K, Email from Derek Hammond, AUSA, USAO, to Peter Bermes & Brandon Levine, Att'y-Advisors, OGC, EPA (Aug. 14, 2019, 11:31 AM), ECF No. 19-15.  EPA continued to make interim productions of responsive records to plaintiff, with 38 pages produced in July 2019, White Decl. ¶ 16; Wilcox Decl. ¶ 24, and six pages in August 2019, White Decl. ¶ 20; Wilcox Decl. ¶ 27.

EPA also "conducted searches across relevant program offices for potentially responsive records using the search method proposed by" plaintiff.  White Decl. ¶ 21.  According to EPA's Director of OEX, "the [a]gency consulted with staff in the Office of Public Affairs, the Office of the Chief Financial Officer, the Office of Mission Support, the National FOIA Office, [and] the Office of Enforcement and Compliance Assurance," among other units, and "[s]ubject matter experts reviewed the [FOIA Request] language and searched for responsive records."  *Id.*  As a

result of these efforts, between November 2019 and March 2020, EPA provided three additional productions of responsive records to plaintiff, consisting of 241 pages, 24 pages, and 38 pages, respectively, along with, in the final production, a link to a public collection of Administrator Wheeler's calendar records and an index of records.  White Decl. ¶¶ 22–23; Def.'s SMF ¶ 11; Pl.'s SMF ¶ 19; Def.'s Resp. SMF ¶ 19; White Decl., Ex. L, Letter from Peter Bermes, Att'y-Advisor, OGC, EPA, to Stuart Wilcox, Env'tl Advocs. (Mar. 25, 2020), ECF No. 19-16.

The March 2020 production was intended to be EPA's last production of responsive records.  White Decl. ¶ 23; Def.'s SMF ¶ 11.  Upon review of the records provided by EPA, however, plaintiff raised concerns about EPA's redactions and missing responsive documents in the form of attachments to former Administrator Wheeler's calendar entries.  *See* White Decl., Ex. M, Letter from Stuart Wilcox, Env'tl Advocs., to Derek Hammond, AUSA, USAO (Apr. 23, 2020), ECF No. 19-17; *id.*, Ex. O, Letter from Stuart Wilcox, Env'tl Advocs., to Derek Hammond, AUSA, USAO (June 18, 2020), ECF No. 19-19; Def.'s SMF ¶ 12; Pl.'s SMF ¶ 20. Plaintiff also indicated in the parties' next status report that it "would like to set an expeditious briefing schedule" as "a useful judicial backstop" against continued delay in addressing its unresolved concerns.  Joint Status Report (Apr. 27, 2020) ¶ 5, ECF No. 14.  A schedule for dispositive motions was accordingly set, along with a June 11, 2020 deadline for the parties to submit a final Joint Status Report indicating whether they would be able to resolve plaintiffs' concerns without motions practice.  Min. Order (Apr. 30, 2020).

The day before the June 11, 2020 deadline, EPA produced some previously withheld materials and attachment records requested by plaintiff, and indicated that a supplement search for calendar attachments would be conducted.  White Decl., Ex. N, Letter from Peter Bermes, Att'y-Advisor, OGC, EPA, to Stuart Wilcox, Env'tl Advocs. (June 10, 2020), ECF No. 19-18;

Def.'s SMF ¶ 13; White Decl. ¶ 25.  This supplemental search for attachments to Administrator

Wheeler's calendar "returned over 200 potentially responsive records," White Decl. ¶ 27, and a

subsequent production of additional records, including "updated versions of Administrator

Wheeler's calendar with some prior redactions removed and . . . the missing attachments to the

Administrator's calendar," was made, Def.'s SMF ¶ 14; *see also* Pl.'s SMF ¶ 20; Wilcox Decl.

¶ 33; White Decl., Ex. P, Letter from Peter Bermes, Att'y-Advisor, OGC, EPA, to Stuart Wilcox,

Env'tl Advocs. (July 10, 2020), ECF No. 19-20.  The parties' last joint status report reflected

receipt of the June 10, 2020 production and indicated that summary judgment briefing would

proceed unless the parties were able "to resolve issues associated with EPA's production of

records" in the interim.  Joint Status Report (June 11, 2020) ¶ 5, ECF No. 15.

   During continuing conferral about areas of disagreement, Def.'s SMF ¶¶ 15–16; Pl.'s

SMF ¶ 20; White Decl. ¶ 30; Wilcox Decl. ¶¶ 31, 34–36, EPA expressed its position that the

FOIA Request "explicitly excluded calendar records pre-dating July 5, 2018 from its scope" and

that, consequently, such records were not responsive to the FOIA Request and would not be

produced, White Decl., Ex. S, Letter from Peter Bermes, Att'y-Advisor, OGC, EPA, to Stuart

Wilcox, Env'tl Advocs. (Aug. 11, 2020) at 1, ECF No. 19-23; *see also id.*, Ex. R, Letter from

Peter Bermes, Att'y-Advisor, OGC, EPA, to Stuart Wilcox, Env'tl Advocs. (Aug. 3, 2020) at 1,

ECF No. 19-22; Def.'s SMF ¶ 16; White Decl. ¶ 30.  As a result of the parties' communications,

EPA made a supplemental production in August 2020, consisting of portions of Administrator

Wheeler's calendar and ten attachments to calendar entries, all with revised redactions.  White

Decl. ¶ 31; Def.'s SMF ¶ 17; Pl.'s SMF ¶ 20; Wilcox Decl. ¶ 36; White Decl., Ex. T, Letter from

Brandon A. Levine, Att'y-Advisor, OGC, EPA, to Stuart Wilcox, Env'tl Advocs. (Aug. 13,

2020), ECF No. 19-24.  A few days later, on August 17, 2020, the same day EPA filed its motion

for summary judgment, *see* Def.'s Mot., the agency made a further production of records, Pl.'s SMF ¶ 21; Def.'s Resp. SMF ¶ 21; Wilcox Decl. ¶ 37; White Decl. ¶ 32, which was supplemented, on September 21, 2020, with production of one additional responsive record, which had been inadvertently omitted from the earlier August 2020 production, Suppl. Decl. of Elizabeth White ("Suppl. White Decl.") ¶ 2, ECF No. 23-3.

In total, EPA made thirteen productions of records to plaintiff, three productions issued prior to litigation and ten productions issued between the filing of the Complaint, on April 8, 2019, and its final production, on September 21, 2020.  Pl.'s Statement of Genuine Issues ¶ 1, ECF No. 21-1; Wilcox Decl. ¶¶ 8, 14, 16, 24, 27–28, 30, 33, 36–37; White Decl. ¶¶ 6, 10, 12, 16, 20, 22–23, 25, 28, 31–32; Suppl. White Decl. ¶ 2.  Simultaneous with its Motion for Summary Judgment, on August 17, 2020, EPA produced an index, pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), describing the documents withheld, either in full or in part, from its productions, and relying on FOIA Exemptions 5, 6, 7(C), 7(E), and 7(F) as the basis for the redactions and withholdings.  Def.'s Mot., Attach., *EcoRights v. EPA*, Civ. A. No. 1:19-CV-00980 (D.D.C.) *Vaughn* Index ("*Vaughn* Index"), ECF No. 19-4.[2]  The redactions and withholdings are further explained in two declarations from Elizabeth White, the Director of OEX.  *See* White Decl.; Suppl. White Decl.

EPA "is no longer asserting Exemption 7(F)" with respect to any of the records included in its *Vaughn* Index, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 3 n.1, ECF No. 19-1, and as a result of further narrowing by the parties during the pendency of the instant cross-

---

[2]     "A *Vaughn* index describes the documents withheld or redacted [by the agency] and the FOIA exemptions invoked, and explains why each exemption applies."  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).  Each of the calendar attachments described in EPA's *Vaughn* Index and declarations has been assigned a Bates number that begins with the identical sequence ED_004712_000, followed by five digits unique to the particular document.  For simplicity, the Court refers to such records only by the five unique digits.

motions, a number of redactions and withholdings under Exemptions 5, 6, 7(C), and 7(E)

initially disputed are no longer at issue.[3]  In the end, the parties dispute the adequacy of EPA's

search, EPA's withholdings due to the agency's interpretation of the scope of the FOIA Request

and invocation of Exemptions 5, 6, 7(C), and 7(E), and EPA's redactions from four responsive

records on segregability and foreseeable harm grounds.[4]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "'[a] party is entitled to summary judgment

only if there is no genuine issue of material fact and judgment in the movant's favor is proper as

a matter of law.'"  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006));

*see also* Fed. R. Civ. P. 56(a).  "In FOIA cases, 'summary judgment may be granted on the basis

of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory

statements, and if they are not called into question by contradictory evidence in the record or by

evidence of bad faith.'"  *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (quoting

---

[3]      These now-uncontested issues include: (1) EPA's withholding of records generated in the process of converting Administrator Wheeler's Outlook calendar records to PDFs, Wilcox Decl. ¶ 44; Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Reply") at 2 n.1, ECF No. 23; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 21 n.18, ECF No. 25; (2) EPA's redaction of the names and phone numbers of an individual who sought a job reference from Administrator Wheeler and an unsuccessful applicant for a position at EPA, Wilcox Decl. ¶ 42; and (3) EPA's withholdings from records outlining the agency's response to various natural disasters and plans for organizational improvement, *id.*; *see also Vaughn* Index, among others.

[4]      Plaintiff challenges on segregability and foreseeable harm grounds only EPA's redaction of portions of three records: (1) a calendar entry, dated July 5, 2018, for a meeting invitation from which EPA withheld "descriptions of documents" attached to the invitation, detailing deliberations "regarding the creation of a framework for managing EPA's laboratories," *Vaughn* Index at 6; (2) a calendar attachment consisting of a briefing document "developed to provide staff recommendations and opinions concerning how to make decisions concerning ozone designations for counties in the San Antonio area," *id.* at 17 (referring to the document by Bates No. 17566); and (3) a calendar attachment consisting of a two-page internal briefing document "provided . . . to the Administrator, and other EPA senior leaders, to review in order to facilitate decision-making on certain citizen science-related issues and plans," *id.* at 18 (referring to the document by Bates No. 17637).  *See* Wilcox Decl. ¶ 42. Plaintiff challenges EPA's withholding of a fourth record, described as "a four-page draft internal document" which "was drafted . . . as a proposed response to [the Office of Water]'s request that [the Office of Research and Development] provide support to OW on certain aspects of Lead and Copper Rule analysis," *Vaughn* Index at 29, only with respect to segregability, *see* Wilcox Decl. ¶ 42.

*Judicial Watch, Inc. v. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the Act's inspection requirements.'" (omission in original) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  Agencies are therefore statutorily mandated to "make . . records promptly available to any person" who submits a request that "reasonably describe such records" and "is made in accordance with [the agency's] published rules."  5 U.S.C. § 552(a)(3)(A).  To balance the public's interest in governmental transparency and "'legitimate governmental and private interests [that] could be harmed by release of certain types of information,'" *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982), FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1979); and then quoting *Abramson*, 456 U.S. at 630); *see also Murphy v. Exec. Off. for U.S. Att'ys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Resp. & Ethics in Wash. v. Dep't of Justice* ("*CREW I*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014.  "[T]hese limited exemptions do not obscure the basic policy that

disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). When an agency invokes an exemption to disclosure, district courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.* ("*EPIC*"), 777 F.3d 518, 522 (D.C. Cir. 2015). The statute "places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Resp. & Ethics in Wash. v. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) ("The Government bears the burden of establishing that the exemption applies."); *DiBacco v. Dep't of Army* ("*DiBacco II*"), 926 F.3d 827, 834 (D.C. Cir. 2019) ("'An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of clamed exemptions,' typically through affidavit or declaration." (quoting *DiBacco I*, 795 F.3d at 195)). This burden does not shift even when the requester files a cross-motion for summary judgment because the agency ultimately "bears the burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold," *Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.* ("*AILA*"), 830 F.3d 667, 673 (D.C. Cir. 2016), while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

13

### III.    DISCUSSION

The remaining disputes between the parties center on five categories of records withheld by EPA: (1) records that EPA contends fall outside the scope of the FOIA Request, consisting of calendar entries (with attachments) dated *before* July 5, 2018, and drafts of an internal memorandum dated November 16, 2018; (2) calendar attachments and notes to calendar entries, consisting of talking points, briefing documents, and meeting agendas, from which certain information was withheld, pursuant to Exemption 5's deliberative process privilege; (3) calendar entries from which information about restaurants frequented by former Administrator Wheeler or his travel arrangements was withheld, pursuant to Exemption 6; (4) calendar entries from which the names and email addresses of Personnel Security Detail ("PSD") agents assigned to protect former Administrator Wheeler were withheld, pursuant to Exemptions 6 and 7(C); and (5) calendar entries for meetings held at the White House, from which specific room locations were withheld, pursuant to Exemption 7(E).  Additionally, plaintiff challenges EPA's segregability and foreseeable harm analyses with respect to its withholdings.  These topics are addressed *seriatim*.

### A.    Adequacy of EPA's Search

Count III of the Amended Complaint challenges the adequacy of EPA's search for records responsive to the FOIA Request.  Am. Compl. ¶¶ 63–65.  EPA defends the adequacy of its search as reasonably calculated to uncover all relevant documents within the scope of the Request, Def.'s Mem. at 7–11, and contends that two categories of records are beyond the scope of the FOIA Request, namely: forty-two attachments to calendar entries, which were created before July 5, 2018, and thus withheld in full or in part, and drafts of an internal memorandum, dated November 16, 2018, on EPA's policies concerning responses to FOIA requests for which EPA did not search, White Decl. ¶ 39; Suppl. White Decl. ¶ 3; *see also* Def.'s Mem. at 4–9;

Def.'s Reply at 1–6.  Plaintiff contends that, as to the calendar attachments, EPA "has effectively

conceded that these disputed records are improperly withheld" through its failure to proffer any

justification for the withholdings, Pl.'s Mem. P. & A. Supp. Cross-Mot. Summ. J. & Opp'n

Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 7, ECF No. 20-1, and that, as to the draft memoranda,

EPA erred in construing the FOIA Request to exclude drafts and, as a result, improperly

withheld them, *id.* at 8–12.  The legal standard for adequacy of a FOIA search is reviewed before

turning to an analysis of EPA's interpretation of the FOIA Request and subsequent search.

### 1.    *Applicable Legal Standard*

The plain language of FOIA makes clear that the agency's obligation to search for

responsive records is triggered when the records sought are "reasonably describe[d]."  5 U.S.C.

§ 552(a)(3)(A).  Thus, assessment of the adequacy of an agency's search for responsive records

"begin[s] . . . by 'first ascertain[ing] the scope of the request itself'" before evaluating the

agency's efforts to identify and collect records within that scope.  *Clemente v. FBI*, 867 F.3d

111, 116 (D.C. Cir. 2017) (second alteration in original) (quoting *Nation Mag., Wash. Bureau v.*

*U.S. Customs Serv.* ("*Nation Mag.*"), 71 F.3d 885, 889 (D.C. Cir. 1995)).  Courts evaluate both

the scope of the FOIA request and the adequacy of the agency's search for responsive records *de*

*novo*.  5 U.S.C. § 552(a)(4)(B); *see also, e.g.*, *DiBacco I*, 795 F.3d at 188 (adequacy of search

reviewed *de novo*); *Dillon v. Dep't of Justice*, 444 F. Supp. 3d 67, 84 (D.D.C. 2020) (scope of

request reviewed *de novo*); *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 97 (D.D.C. 2013)

(same).

In defining the description of the records sought and the scope of the concomitant search,

"an agency 'has a duty to construe a FOIA request liberally,'" *Inst. for Justice v. IRS*, 941 F.3d

567, 572 (D.C. Cir. 2019) (quoting *Nation Mag.*, 71 F.3d at 890), and to "read FOIA requests 'as

drafted,'" *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (quoting *Miller*

*v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984)); *see also People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014).  At the same time, "agencies are not obligated to search 'beyond the four corners of the request,'" as defined by the requester's description of the records sought, "'nor are they required to divine a requester's intent.'"  *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 160 (D.D.C. 2018) (quoting *Am. Chemistry Council, Inc. v. Dep't of Health & Hum. Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013)).  Moreover, these duties do not obviate the requester's statutory burden to "'reasonably describe[]' the records sought." *Inst. for Justice*, 941 F.3d at 572 (quoting 5 U.S.C. § 552(a)(3)(A)).

For records that fall within the scope of a FOIA request, an agency complies with its FOIA search obligations by "simply . . . 'conduct[ing] a search reasonably calculated to uncover all relevant documents."  *In re Clinton*, 973 F.3d 106, 116 (D.C. Cir. 2020) (emphasis omitted) (quoting *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994)).  Thus, "a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the *search* for [the requested] documents was *adequate*.'"  *Id.* (emphasis in original) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)); *see also Clemente*, 867 F.3d at 117 (describing an agency's burden to "'show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested'" (quoting *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990))).  At summary judgment, the agency "can satisfy this burden through a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'"  *Machado Amadis*, 971 F.3d at 368

(quoting *Oglesby*, 920 F.2d at 68). Courts "accord such affidavits 'a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'" *Id.* (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)); *see also Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017). The requester, then, bears the burden of overcoming this presumption of good faith by "rais[ing] substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials" that the search was adequate. *DiBacco I*, 795 F.3d at 188 *(*internal quotation marks and citation omitted); *see also Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (upholding agency's search as adequate when requester "ha[d] not presented sufficient evidence to rebut [the] presumption" of good faith).

Plaintiff contends that EPA too narrowly construed the scope of the FOIA Request with respect to two categories of records that EPA withheld, in whole or in part, without explanation. Pl.'s Opp'n at 7–12; Pl.'s Reply at 21–23. This allegation, if true, would necessarily render EPA's search inadequate. EPA's interpretation of the FOIA Request to exclude these records, and the resulting adequacy of its search, are addressed in turn.

### 2. *Pre–July 5, 2018 Calendar Entry Records*

The first category of records claimed by EPA to fall outside the FOIA Request consists of forty-two attachments to Administrator Wheeler's calendar entries withheld in full or in part, for which EPA offered no explanation in its *Vaughn* Index or initial declaration. *See Vaughn* Index; Wilcox Decl. ¶¶ 39–41; *id.*, Ex. 32, Compiled Calendar Attachment Records Produced by EPA with Redactions and Not Included in *Vaughn* Index, ECF No. 20-36; *id.*, Ex. 33, Bates No. 17738 (Calendar Attachment Produced by EPA with Redactions), ECF No. 20-37; *id.*, Ex. 34, Bates No. 18131 (Calendar Attachment Produced by EPA with Redactions), ECF No. 20-38. All of these attachments were "associated with calendar entries that pre-date July 5, 2018," with the

calendar entry dates linked to the disputed attachments ranging from May 1, 2018 to July 2, 2018.  Suppl. White Decl. ¶ 3 (providing Bates numbers and dates for the calendar entries to which each of the contested document was attached).[5]

EPA contends that, because these attachments were attached to calendar entries predating July 5, 2018, they are beyond the scope of Part 6 of the FOIA Request, which limited its request for records associated with former Administrator Wheeler's calendar to those documents "constituting or memorializing" the Administrator's calendar "from July 5, 2018 to the present," FOIA Request at 3, and the agency therefore was not obligated either to produce them or to explain any withholdings or redactions.  *See* Suppl. White Decl. ¶ 3; Def.'s Reply at 1–2.  In contrast, the agency produced responsive, non-exempt records attached to calendar entries with dates of July 5, 2018 or later.  *See, e.g.*, White Decl. ¶¶ 23, 31–32.  Plaintiff counters that EPA's failure to properly justify its withholdings under an exemption means that the agency "has failed to meet its burden to withhold this information . . . and must produce these records."  Pl.'s Opp'n at 7.

As EPA correctly points out, by requesting calendar records "from July 5, 2018 to the present," FOIA Request at 3, Part 6 of the FOIA Request "specifically sought Administrator Wheeler's calendar records *since* July 5, 2018, the day he became the Acting EPA Administrator," Def.'s Reply at 2.  The plain language of the FOIA Request thus unambiguously states that responsive calendar records are those dated July 5, 2018 or later.  Plaintiff does not propose an alternative interpretation of Part 6 of its Request, arguing instead that it "did not

---

[5]     Plaintiff originally challenged EPA's withholdings from forty-three such calendar attachments.  Wilcox Decl. ¶¶ 39–41.  One of the challenged attachments, with Bates No. 04415, post-dates July 5, 2018.  Def.'s Reply at 2 n.2.  EPA represents that it "had intended to produce [this record] in full," but it "was inadvertently omitted from the August 14, 2020 production."  Suppl. White Decl. ¶ 2.  The record was "produced in full" to plaintiff on September 21, 2020 and therefore is no longer at issue.  *Id.*; *see also* Def.'s Reply at 2 n.2; Pl.'s Reply at 21 n.18.

agree to forego challenging [the pre–July 5, 2018 calendar records] at any time during the conferral process with EPA and EPA has provided no basis on which it can withhold these records." Pl.'s Opp'n at 7. This argument misconstrues EPA's obligations under FOIA. Otherwise-responsive calendar entries and associated attachments dated before July 5, 2018 are squarely outside the scope of the FOIA Request and thus EPA is not required either to release them or to explain its failure to do so. *See, e.g.*, *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020) ("Under FOIA, an agency is only obligated to release nonexempt records if it receives a request that 'reasonably describes such records,'" that is, if the nonexempt records fall within the scope of the request. (quoting 5 U.S.C. § 552(a)(3)(A))). Plaintiff's later representations concerning these records do not alter the limits imposed by the plain text of its Request. *See, e.g.*, *Am. Oversight v. Dep't of Justice*, 401 F. Supp. 3d 16, 34 (D.D.C. 2019) ("An agency must liberally construe a FOIA request . . . but it is not obligated to rewrite the request to ask for more than the requester did." (internal quotation marks and citations omitted)); *Coss v. Dep't of Justice*, 98 F. Supp. 3d 28, 34 (D.D.C. 2015) ("Although FOIA requires an agency to produce all records 'reasonably described,' a FOIA plaintiff may not expand the scope of his request once his original request is made."). EPA thus did not err in interpreting the FOIA Request to exclude any attachment to a calendar entry predating July 5, 2018.

### 3. *Drafts of the Awareness Notification Memorandum*

The second category of withheld records that, in EPA's view, are not covered by the FOIA Request consists of drafts of a November 16, 2018 memorandum issued by EPA's then–Chief of Staff, titled "Awareness Notification Process for Select Freedom of Information Act Releases" (the "Awareness Notification Memorandum"). This memorandum sets out EPA's policy of providing politically sensitive records sought by FOIA requesters to political appointees within the agency before releasing them to the public. *See* Wilcox Decl., Ex. 44,

Memorandum from Ryan Jackson, Chief of Staff, EPA, to EPA Staff re Awareness Notification Process for Select Freedom of Information Act Releases (Nov. 16, 2018) at 1–3, ECF No. 20-48. EPA produced to plaintiff the final version of the Awareness Notification Memorandum that was circulated to staff, White Decl. ¶ 38, but did not collect or produce earlier drafts, *id.* ¶ 39.  In EPA's view, draft memoranda are not encompassed by Part 8 of the FOIA Request, which sought "[a]ll documents created by EPA since July 5, 2018 constituting or memorializing any instructions, directive, plan, policy, practice, or memorandum *to EPA staff* concerning how to review and/or respond to Freedom of Information Act ('FOIA') requests," FOIA Request at 3 (emphasis added), because pre-final versions of the Awareness Notification Memorandum "were not *circulated* to EPA staff as an instruction, directive, plan, policy, practice or memorandum," White Decl. ¶ 39 (emphasis added); *see also* Def.'s Mem. at 8–9; Def.'s Reply at 3–6.

EPA's interpretation of the FOIA Request as restricted to documents actually sent as instructions to agency staff does not cover drafts.  Notably, the text of the request itself does not expressly reference or use the word "draft."  Nonetheless, plaintiff urges a reading of Part 8 of its Request to encompass drafts, positing that this part of the request was not limited to documents actually circulated "to EPA staff," but also covered more broadly "all documents constituting, memorializing, explaining or commenting upon" the described topic, citing the Request's first sentence, which applies this broader language to each of the Request's ten discrete parts.  Pl.'s Opp'n at 8–10; *see also* FOIA Request at 1, 3; *supra* Part I.A.[6]  Reading the FOIA Request through this lens, the first sentence's request for documents "explaining or commenting upon" the specific topics enumerated in the Request's ten parts expands Part 8 beyond its text to request

---

[6]  Plaintiff did not raise this interpretive argument at any time during the parties' conferral process, instead contending that "[u]npublished internal drafts would of course necessarily be circulated to and/or written by EPA staff" and therefore fell within the plain language of Part 8 standing alone.  Clarification Email.  Since this contention is neither raised nor addressed by either party in summary judgment briefing, it is not considered here.

not only documents "constituting or memorializing" directions to staff regarding FOIA requests but also documents "explaining or commenting upon" such directions.  Pl.'s Opp'n at 10.

Even adopting plaintiff's preferred construction, the FOIA Request does not reach far enough to include in its scope drafts of the documents sought in Part 8.  The scope of Part 8's request for documents "constituting or memorializing any instructions, directive, plan, policy, practice, or memorandum to EPA staff" turns on the meaning of the key phrase "to EPA staff." That phrase may be construed as referring either to final instructions, directives, plans, policies, practices, or memoranda *actually* disseminated to EPA staff, as EPA suggests, or to any such documents that were *intended* eventually to be disseminated to EPA staff.  The former construction would exclude drafts; the latter would include them.  Without further clues in the text of Part 8, "to EPA staff" is fairly read either way, and the choice of one interpretation over the other is a close call.  The ordinary use and meaning of the phrase weigh slightly in favor of a reading that encompasses only documents actually disseminated to EPA staff.  Moreover, instead of relying on a somewhat strained theory of the interaction between the first sentence of the FOIA Request and the language of Part 8 to obtain drafts of the Awareness Notification Memorandum, plaintiff could have submitted a FOIA request explicitly seeking draft records, and remains free to do so.  *See, e.g.*, *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 70 (D.D.C. 2017) (noting that plaintiff could "submit another FOIA request" to receive documents found to be outside the scope of the FOIA request at issue in the case).[7]

---

[7]    Even if Part 8 of the FOIA Request did include drafts, plaintiff would not necessarily be entitled to receive drafts of the Awareness Notification Memorandum.  As discussed in more detail *infra* Part III.B.1, FOIA's Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), including documents that would be shielded from disclosure under the deliberative process privilege, *see Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  This privilege safeguards "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Although "[d]irectives from decisionmakers [to subordinates] are not covered by the deliberative process privilege,"

On balance, then, EPA's interpretation of Part 8 as requesting only documents actually circulated to EPA staff narrowly prevails.  To the extent that the first sentence of the FOIA Request in fact expands Part 8 to seek documents "explaining or commenting upon" these circulated directives, as plaintiff suggests, the broader request would be for records created in reference to the final, circulated documents that, for example, elaborate, describe, seek to implement, or otherwise discuss the instructions actually received by EPA staff.  Prior drafts of a disseminated document, by definition, do not serve any of these functions with respect to the final document and therefore do not explain or comment upon the documents sought in Part 8 of the Request.

To bolster the argument that the FOIA Request is properly construed to include drafts of the Awareness Notification Memorandum, plaintiff next asserts that its clarification during the parties' conferral process that Part 8 should be understood to "include any draft and/or final EPA regulations implementing FOIA and any records related thereto," Clarification Letter at 6 (emphasis omitted), should have eliminated any doubt as to the scope of the Request, *see* Pl.'s Mem. at 10–12; Pl.'s Reply at 21–23.  As EPA correctly notes, however, "a requester cannot expand a FOIA request after it is made" through later clarifications.  Def.'s Reply at 4 (citing *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 388 (D.C. Cir. 1996); *Coss*, 98 F. Supp. 3d at 34); *see also, e.g.*, *Brown v. Wash. Metro. Area Transit Auth.*, Civ. A. No. 19-cv-2853 (BAH), 2020 WL 806197, at *11 (D.D.C. Feb. 18, 2020) (finding that a requester's "subsequent clarification"

---

*Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 79 (D.D.C. 2018), the privilege has been applied to allow agencies to withhold drafts of final instructions that were eventually distributed to staff that reflect the agency's deliberations as to the content of the directives ultimately given, *see, e.g.*, *Heartland All. for Hum. Needs & Hum. Rights v. Immigr. & Customs Enf't*, 406 F. Supp. 3d 90, 121–22 (D.D.C. 2019) (holding intra-agency draft of an operational plan to be covered by the deliberative process privilege); *Soghoian v. Off. of Mgmt. & Budget*, 932 F. Supp. 2d 167, 182 (D.D.C. 2013) (finding a draft of a document outlining agency policy with respect to agreements with internet service providers exempt from disclosure because the information in the draft constituted "ideas passed back and forth about what . . . instructions [to staff] ultimately may be").  EPA might therefore successfully invoke Exemption 5 to withhold drafts of the Awareness Notification Memorandum if such a request is expressly made.

of his request "did not require [the agency] to restart the [response] process for his reformulated request" (internal quotation marks and citation omitted)); *Judicial Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450, 456 (D.D.C. 2016) ("An agency's reasonable effort to satisfy a FOIA request 'does not entail an obligation to search anew based upon a subsequent clarification.'" (quoting *Kowalczyk*, 73 F.3d at 388)).  The conclusion that the FOIA Request does not extend to drafts of FOIA–related instructions circulated to EPA staff means that plaintiff's subsequent clarifications do not operate to expand the scope of the Request and, as such, are owed no weight in the scope analysis.  *See, e.g.*, *Miller*, 730 F.2d at 777 (rejecting effort to expand a FOIA request that "was not broadly drawn; it made a specific inquiry about specific actions"); *Am. Oversight*, 401 F. Supp. 3d at 34 (finding that a request for documents "provided to" an individual could not fairly be read, even after plaintiff's clarifications, to encompass "records that reflected guidance or directives," such as meeting notes, that were not actually given to the individual); *Wallick*, 281 F. Supp. 3d at 66–68 (concluding that plaintiff's clarifying emails did not expand his FOIA request, which sought information about a single application, to include records related to subsequent applications).

In short, EPA properly construed Part 8 of the FOIA Request to exclude drafts of the Awareness Notification Memorandum.  The agency therefore had no obligation to search for, or to explain its withholding of, such records.

### 4.    *Adequacy of EPA's Search*

EPA conducted a search for responsive records predicated on its reasonable construction of the FOIA Request.  Aside from the disputes about the scope of the FOIA Request resolved above, plaintiff neither raises any specific objection to the adequacy of EPA's search nor attempts to rebut the presumption of good faith otherwise owed to the declarations of EPA's Director of OEX, *see* White Decl.; Suppl. White Decl.  *See DiBacco I*, 795 F.3d at 188.  The

search detailed in those declarations demonstrates beyond material doubt that EPA has

"conduct[ed] a search reasonably calculated to uncover all relevant documents.'"  *In re Clinton*,

973 F.3d at 116 (emphasis, internal quotation marks, and citation omitted).  As set forth in detail

above, EPA assigned portions of the FOIA Request to OEX, OIG, and OGC, following agency

guidelines.  *See supra* Part I.B.  After a Boolean search by OGC generated approximately

212,000 potentially responsive records, EPA consulted with plaintiff as to the volume of records

and adopted an alternative approach, proposed by plaintiff, under which EPA conducted a search

guided by consultations with agency staff and subject-matter experts.  *Id.*  The agency consulted

with its Office of Public Affairs, Office of the Chief Financial Officer, Office of Mission

Support, National FOIA Office, and Office of Enforcement and Compliance Assurance, among

others.  *Id.*  EPA and plaintiff regularly communicated throughout this process, and EPA

attempted to address plaintiff's concerns, either by producing additional records or by explaining

its withholdings.  The agency undertook supplemental searches to rectify potential gaps in the

productions identified by plaintiff.  *Id.*  In total, EPA made thirteen productions of responsive

records to plaintiff.  *Id.*  This process, in which plaintiff was both consulted and involved, was a

reasonable one, targeted at identifying documents responsive to the FOIA Request.  As to Count

III, EPA is therefore entitled to summary judgment.

### B.     Application of FOIA Exemptions

Count II of the Amended Complaint alleges that EPA unlawfully withheld, in full or in

part via redaction, records responsive to plaintiff's FOIA Request.  Am. Compl. ¶¶ 60–62.  FOIA

"requires government agencies to make information available upon request, unless the

information is protected by one of" FOIA's nine exemptions.  *Judicial Watch, Inc. v. Dep't of

Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017).  An agency must prove the applicability of claimed

exceptions, and can do so through a *Vaughn* index, and supporting affidavits or declarations, that

"describe[] the justifications for withholding the information with specific detail, demonstrate[] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *DiBacco II*, 926 F.3d at 834 (internal quotation marks and citation omitted); *see also, e.g.*, *CREW I*, 746 F.3d at 1088; *Poitras*, 303 F. Supp. 3d at 150 ("An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate."). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

Plaintiff contests EPA's withholding, in full or in part, pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E), of sixty-one records comprised of forty-nine calendar entries and twelve calendar attachments. *See Vaughn* Index at 2, 3, 4, 5, 7, 10, 11, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23. The agency's withholdings under each exemption are examined in turn.

### 1.   *Information Withheld Pursuant to Exemption 5*

Plaintiff disputes EPA's withholdings, pursuant to FOIA Exemption 5, of one calendar entry, *Vaughn* Index at 7–8, and twelve documents attached to calendar entries, *id.* at 10–17, 19–24. Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "'Among th[e] privileges protected by Exemption 5 is the . . . deliberative process privilege,'" *Judicial Watch, Inc.*, 847 F.3d at 739 (alteration and omission in original) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)); *see also Abtew v.*

*Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015), which protects government

"'documents reflecting advisory opinions, recommendations and deliberations comprising part of

a process by which governmental decisions and policies are formulated,'" *Dep't of Interior v.*

*Klamath Water Users Protective Ass'n* ("*Klamath Water Users*"), 532 U.S. 1, 8 (2001) (quoting

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).   The deliberative process privilege is

predicated on the theory that "agencies craft better rules when their employees can spell out in

writing the pitfalls as well as the strengths of policy options, coupled with the understanding that

employees would be chilled from such rigorous deliberation if they feared it might become

public," *Judicial Watch, Inc.*, 847 F.3d at 739, and thus is intended to "protect[] 'debate and

candid consideration of alternatives within an agency,' thus improving agency decisionmaking,"

*Machado Amadis*, 971 F.3d at 371 (quoting *Jordan v. Dep't of Justice*, 591 F.2d 753, 772 (D.C.

Cir. 1978) (en banc)); *see also Klamath Water Users*, 532 U.S. at 8–9 (finding that the

deliberative process privilege "rests on the obvious realization that officials will not

communicate candidly among themselves if each remark is a potential item of discovery and

front page news").

        "To qualify for the deliberative process privilege, an intra-agency memorandum must be

both pre-decisional and deliberative."  *Abtew*, 808 F.3d at 898 (citing *Coastal States Gas Corp.*

*v. Dep't of Energy* ("*Coastal States*"), 617 F.2d 854, 866 (D.C. Cir. 1980)); *see also Hall &*

*Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020).  "Documents are 'predecisional' if they are

'generated before the adoption of an agency policy,' and 'deliberative' if they 'reflect[] the give-

and-take of the consultative process.'"  *Judicial Watch, Inc.*, 847 F.3d at 739 (alteration in

original) (quoting *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir.

2010)).

In showing that withheld records meet this standard, the government must explain, for each withheld record, at a minimum "(1) 'what deliberative process is involved,' (2) 'the role played by the documents at issue in the course of that process,' and (3) 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'" *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (alteration in original) (first quoting *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987); and then quoting *Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011)).  As to the third requirement, "[t]he D.C. Circuit has acknowledged that '[t]he identity of the parties to the memorandum is important' because 'a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.'" *Trea Senior Citizens League v. Dep't of State*, 923 F. Supp. 2d 55, 69 (D.D.C. 2013) (second alteration in original) (quoting *Coastal States*, 617 F.2d at 868).  "[T]he government, not the requester, must identify the deliberative process to which any record relates." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 101 (D.D.C. 2019) (citing *100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017)); *see also Senate of P.R.*, 823 F.2d at 585 ("[T]o approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1981))).

Pursuant to Exemption 5, plaintiff contests EPA's withholding, in full or in part, of (1) three calendar attachments which are "briefing documents prepared to assist the Administrator, and other relevant EPA senior leaders, with making a particular decision or decisions" within

EPA, White Decl. ¶ 55; *see Vaughn* Index at 10–11, 12–14; (2) one calendar entry and eight

calendar attachments which are "internal briefing material" and "suggestions for discussion

topics and talking points" to prepare former Administrator Wheeler for two meetings with

foreign dignitaries, five phone calls with various elected officials, and an interview with the

*Washington Examiner*, Def.'s Mem. at 15; *see* White Decl. ¶¶ 52, 60–62; *Vaughn* Index at 7, 11–

12, 14–15, 16–17, 19–24; and (3) a calendar attachment of an agenda for an upcoming meeting

of the National Economic Council ("NEC") and representatives of several government agencies,

White Decl. ¶ 65; *Vaughn* Index at 15.  Each category of records is addressed in turn.

### a)      Briefing Documents

EPA has asserted the deliberative process privilege to protect three briefing documents

included as attachments to entries on Administrator Wheeler's calendar.  The first briefing

document is described as a one-page agenda presenting "options for resolution of a dispute that

arose under the Federal Facilities Agreement (FFA) that governs the superfund cleanup at the

Edwards Air Force Base South Air Force Research Laboratory," prepared by EPA staff for

Administrator Wheeler and other senior EPA leaders.  White Decl. ¶ 56; *see also Vaughn* Index

at 10–11 (referring to the document by Bates No. 04639).  EPA withheld, pursuant to Exemption

5, sections of the document on "Options for Resolution Discussion" and "Action Items and Path

Forward."  White Decl. ¶ 56; *Vaughn* Index at 10.  The withheld sections "reflect[] options for

resolution and the thoughts of staff related to action items and a path forward on this [FFA]

dispute."  White Decl. ¶ 57; *see also Vaughn* Index at 10.  These options were "generated prior

to arriving at a final decision concerning EPA's actions with regard to resolution of the dispute."

White Decl. ¶ 57; *see also Vaughn* Index at 10.  The document as a whole was intended to "brief

the Administrator, and other Agency leaders, on a decision regarding a dispute that arose under

the FFA" and "was provided to the Agency's senior leaders to solicit feedback and final

decision-making on staff's proposed options." *Vaughn* Index at 10; *see also* White Decl. ¶ 57.

EPA has thus adequately stated what deliberative process is involved (EPA's deliberations

regarding the resolution of an FFA dispute); the role the withheld sections of the document

played (presenting options for resolution of the dispute developed by staff to agency leadership);

and the nature of the decisionmaking authority of the authors of the document (EPA staff tasked

with evaluating the FFA dispute and formulating possible solutions for superiors' consideration).

The "Options for Resolution Discussion" and "Action Items and Path Forward" sections were

properly withheld.

EPA next asserts the privilege with respect to a one-page briefing document drafted by

EPA staff to "brief the Administrator, and other senior leaders, in order to facilitate decision-

making related to the registration review for the pesticide Chlorpyrifos." *Vaughn* Index at 12

(referring to the document by Bates No. 05410). The portions of the document withheld

pursuant to Exemption 5, titled "Issue" and "Timeline," detailed "internal Agency discussion and

deliberation . . . , including tentative plans and estimated timelines, on the continued

coordination with the [National Marine Fisheries Service] that is required as part of the pesticide

registration review" and analysis related to "[Endangered Species Act] consultation with the

National Marine Fisheries Service." *Id.* Again, EPA asserts that this document "was generated

prior to arriving at a final decision concerning EPA's actions regarding the registration review

for the pesticide Chlorpyrifos." *Id.* Much the same analysis thus applies to this document. The

deliberative process involved is the discussion of possible approaches to the statutorily required

interagency consultation for the then-ongoing Chlorpyrifos registration review; the document

memorializes internal agency deliberations about that process while it was in progress; and the

individuals involved are EPA staff responsible for briefing the Administrator and other senior agency leaders. *Id.*

Nonetheless, plaintiff challenges application of the deliberative process privilege, contending that the withheld "Issue" and "Timeline" sections of this document provide "descriptive and factual information that does not expose the back and forth of EPA's policy development on these issues" and therefore are not "deliberative" within the meaning of the exemption. Pl.'s Reply at 7; *see also* Pl.'s Opp'n at 22. EPA counters that these sections are not factual in nature because the "Issue" section provides "EPA staff's characterizations of specific issues related to this topic," Def.'s Reply at 9, while the "Timeline" section "contains estimated timelines related to EPA activity on the topic, as well as EPA's plans for continued activity on the matter," *id.* at 9–10; *see also Vaughn* Index at 12. As the agency points out, EPA's consideration of how to frame the discrete issues implicated by the Chlorpyrifos review, its "tentative plans and estimated timelines," *Vaughn* Index at 12, and staff assessments and recommendations with respect to these questions extend beyond mere description into internal discussion and analysis relating to EPA's work and coordination with NMFS, Def.'s Reply at 10. The agency's explanation for its withholding thus adequately shows that the "Issue" and "Timeline" sections are deliberative in nature. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 369 F. Supp. 3d 1, 24 (D.D.C. 2019) (applying the deliberative process privilege to EPA briefing documents on Endangered Species Act consultations in a pesticide registration review). To the extent that plaintiff is correct in its claim that these sections contain purely factual or descriptive information that EPA should have produced, that argument goes to the question of whether EPA has fulfilled its obligation to release all reasonably segregable, non-exempt information within this document, discussed *infra* Part III.D.

Finally, EPA asserts the deliberative process privilege with respect to a three-page briefing document, withheld in full except for its title and footers, that was prepared by EPA staff "to brief the Administrator, and other relevant senior leaders, in order to facilitate decision-making related to revisions to the Lead and Copper Rule and the next steps in the process that were identified by staff." *Vaughn* Index at 13 (referring to the document by Bates No. 05438). EPA again claims that the document "was generated prior to arriving at a final decision concerning EPA's actions with regards to the Rule" because "[a]t the time, EPA was still deliberating about the best approach to revising the Rule." *Id.* It further asserts that "the withheld information reflects staff's framing of the issue and options available to the Agency." *Id.* This document, too, qualifies for the deliberative process privilege. The deliberative process involved is the evaluation of possible revisions to the Lead and Copper Rule and the best method by which to make any such revisions. The document reflects analysis provided to senior leadership before a final decision was reached, and the individuals who prepared the document are EPA staff providing requested analysis, opinions, and suggestions to their superiors, thereby satisfying all requirements for properly invoking the privilege.

**b)**     **Suggested Talking Points**

Second, EPA raises the deliberative process privilege to protect calendar attachments and a calendar entry consisting of "internal briefing material for Administrator Wheeler containing preliminary thoughts and proposals for potential talking points and discussion topics" for an upcoming meeting with the Australian Minister for the Environment and Energy and an official celebration of the Emperor of Japan's birthday, held at the Ambassador of Japan's residence, Def.'s Mem. at 15; *see also* White Decl. ¶¶ 52, 60–62; *Vaughn* Index at 7, 11–12, 14–15; "suggestions for discussion topics and talking points" for five scheduled phone calls "with

31

various senators and state officials," Def.'s Mem. at 15; *see also* White Decl. ¶¶ 60–62; *Vaughn*

Index at 16–17, 19–22, 23–24; and "an internal briefing document for Administrator Wheeler

suggesting discussion topics and/or questions that could be raised during an upcoming interview"

with the *Washington Examiner*, Def.'s Mem. at 15; *see also Vaughn* Index at 22–23.

### (i)      *Talking Points Are Not Categorically Excluded from Deliberative Process Privilege*

At the outset, the parties dispute the applicability of the deliberative process privilege to

talking points and other records that reflect an agency's consideration of how to present its

policies and decisions to the public and elected or foreign officials.  Their disagreement centers

on whether such records are predecisional, a determination that turns on how best to characterize

the agency decision at issue.  EPA submits that its "decisions about how and what to

communicate to the public or to Congress are important agency decisions in and of themselves,"

so that documents reflecting deliberations on external communications may be predecisional if

they precede the communication actually made, Def.'s Reply at 6 (citing *Krikorian v. Dep't of

State*, 984 F.2d 461, 466 (D.C. Cir. 1993)), while plaintiff contends that "talking points [and

similar documents that] discuss decisions already made" by the agency are nothing more than

debates about how to communicate past decisions, and therefore "are not properly withheld

under the deliberative process privilege because they are not predecisional to any actual agency

decision," Pl.'s Opp'n at 18; *see also* Pl.'s Reply at 1–6.

As plaintiff correctly submits, "[t]he deliberative process privilege does not lend itself to

bright line rules because it 'is so dependent upon the individual document and the role it plays in

the administrative process.'"  Pl.'s Opp'n at 17 (quoting *Elec. Frontier Found.*, 826 F. Supp. 2d

at 167–68); *see also id.* at 17 n.4 (collecting cases that stand for the proposition that an agency

must show that every withheld record, including talking points and similarly communication-

32

focused documents, meets the requirements for exemption); Pl.'s Reply at 5 n.3 (same).  While

EPA is therefore obligated to show that each of the individual talking points and briefing

materials in this category qualifies for exemption under the deliberative process privilege, *see,

e.g.*, *Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) (finding "generalized allegations of

exemptions" unacceptable (internal quotation marks and citation omitted)), some general

consideration of whether, for purposes of the deliberative process privilege, an agency's

discussion of public statements concerning its actions represents an distinct agency decision or

merely reflects a decision already made, is warranted.

The D.C. Circuit has not determined, as a categorical matter, "whether or not discussions

about public statements to outside entities are protected under the deliberative process privilege."

*Leopold v. Off. of Dir. of Nat'l Intel.*, 442 F. Supp. 3d 266, 275 (D.D.C. 2020); *see also Am. Ctr.

for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 302 (D.D.C. 2018) ("[T]he D.C. Circuit

does not appear to have addressed the application of the deliberative process privilege to the

formulation of an agency's public statements[.]").  The purpose of the privilege—to "protect[]

open and frank discussion among those who make [decisions] within the Government," *Klamath

Water Users*, 532 U.S. at 9; *see also Sears, Roebuck & Co.*, 421 U.S. at 150 (holding that the

deliberative process privilege safeguards the "process by which governmental decisions are

formulated" (internal quotation marks and citation omitted)); *Machado Amadis*, 971 F.3d at 371

(finding that the deliberative process privilege "protects debate and candid consideration of

alternatives within an agency, thus improving agency decisionmaking" (internal quotation marks

and citation omitted))—suggests that an agency's development of its statements to the public and

other outside entities via talking points and similar documents is the type of decision to which it

applies.  Such records are typically "prepared by [agency] employees for the consideration of

33

[agency] decision-makers," *Judicial Watch, Inc. v. Dep't of Com.*, 337 F. Supp. 2d 146, 174

(D.D.C. 2004), and, when "prepared by more junior staffers for a more senior official [are] rarely

the final decision about what the senior official will say," *Am. Ctr. for Law & Justice v. Dep't of

Justice*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018). Rather, they "reflect a discourse that occurred

during the decision-making process concerning . . . what strategy the [agency] should take" and,

assuming that "no official statement has yet been made [at the time when they are drafted], . . .

remain ripe recommendations that are ready for adoption or rejection by the [agency]." *ACLU v.

Dep't of Homeland Sec.*, 738 F. Supp. 2d 93, 112 (D.D.C. 2010).

　　　Documents of this nature therefore may contain predecisional agency analysis about what

information to share with external stakeholders or the general public and how best to

communicate it, a strategic determination that is best informed by the type of candid

conversations within an agency that the deliberative process privilege seeks to preserve. *See,

e.g.*, *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 172 ("[I]f agency deliberations about public

statements were FOIA–able, then agencies would be hamstrung in their dealings with the press

[and other outside entities], defeating the very transparency FOIA aims to foster."). As EPA

explains, "[r]evealing this type of information would reveal EPA staff's deliberations concerning

how to communicate EPA's positions to important stakeholders and the public, decisions that in

and of themselves are crucial to the effective work of the Agency." Def.'s Reply at 7. At least

two circuits, and the overwhelming majority of Judges on this Court, have thus concluded that an

agency's consideration of what information to present to external parties and how to present it is

a decision in itself, distinct from the underlying policy decision that is the subject of any

anticipated communication, and thus can qualify a record of such consideration for exemption under the deliberative process privilege.[8]

In an effort to diminish the weight of this strong consensus, plaintiff relies on *Trea Senior Citizens League v. Department of State* ("*Trea II*"), 994 F. Supp. 2d 23 (D.D.C. 2013), and *Public Citizen, Inc. v. Office of Management of Budget*, 598 F.3d 865 (D.C. Cir. 2010), for the proposition that "[w]here talking points discuss decisions already made, . . . they are not properly withheld under the deliberative process privilege because they are not predecisional to any actual agency decision."  Pl.'s Opp'n at 18; *see also* Pl.'s Reply at 5–6.  Neither case sets forth such a categorical rule.  *Trea II,* in evaluating the applicability of the deliberative process privilege to a talking-points document developed for use in a bilateral negotiation between the United States and Mexico culminating in a formal agreement between the two nations, determined only that the talking points at issue were not predecisional with respect to that agreement because they were "dated . . . nearly seven years after the Agreement was signed."  994 F. Supp. 3d at 36.  Likewise, *Public Citizen*, a case assessing the withholding of intra-agency documents related to interagency review of proposed legislation, makes only the general pronouncement that "[a]

---

[8]     *See, e.g.*, *ACLU v. Dep't of Justice*, 844 F.3d 126, 133 (2d Cir. 2016) (holding "a set of suggested talking points concerning the legal basis for drone strikes" and "a draft of a proposed op-ed article that suggested some ways of explaining the Government's legal reasoning in support of drone strikes" were "predecisional and need not be disclosed" because "[g]overnment officials do not lose the protection of Exemption 5 by considering informally how to present a legal analysis"); *N.H. Right to Life v. Dep't of Health & Hum. Servs.*, 778 F.3d 43, 54 (1st Cir. 2015) (finding that documents in which an agency considered how to make a "public announcement" of a grant award "deal with the Department's decision of how and what to communicate with the public, which is a decision in and of itself"); *Husch Blackwell LLP v. EPA*, 442 F. Supp. 3d 114, 122–23 (D.D.C. 2020) (finding "materials preparing officials for congressional testimony and draft responses to Congress," "draft question and answer responses," and "draft web content and news briefs" exempt from disclosure under the deliberative process privilege (internal quotation marks omitted)); *Am. Ctr. for Law & Justice v. Dep't of Justice*, 392 F. Supp. 3d 100, 106 (D.D.C. 2019) ("[T]he privilege applies to agency deliberations about future public statements, including talking points," but "that protection is not categorical."); *Watkins Law & Advoc., PLLC v. Dep't of Vets. Affs.*, 412 F. Supp. 3d 98, 122 (D.D.C. 2019) (finding that "internal talking points fall within the scope of the deliberative process privilege"); *Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 177 (D.D.C. 2018) ("[C]ourts have generally found that documents created in anticipation of press inquiries are protected even if crafted after the underlying event about which the press might inquire.").

document that does nothing more than explain an existing policy cannot be considered deliberative." 598 F.3d at 876 (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)). This statement does not stand in tension with the majority view that documents containing deliberation about communications may be deliberative, to the extent that they consider, in a preliminary fashion before use by an agency decisionmaker, the content of talking points in the process of formulating the agency's decision of what information to share and how to share it.

Plaintiff turns next to *Krikorian v. Department of State*, 984 F.2d 461 (D.C. Cir. 1993), a case cited by EPA that found the deliberative process privilege exempted from disclosure documents discussing how an agency "should respond to the reaction of some members of the public" to a published article repeating a statement contradictory to a longstanding agency policy, including "two draft letters proposing two options for replies to public inquiries" about the article, *id.* at 466; *see also* Def.'s Reply at 6. The controversial statement was later retracted by the agency. *Krikorian*, 984 F.2d at 463. Plaintiff attempts to argue that the *Krikorian* court reached its conclusion "[b]ecause the policymaking process," that is, the agency's decision of whether or not to retract the statement, "was still actively ongoing," and that the disputed records are therefore distinguishable from the records at issue here, which were developed "merely to discuss policies [EPA] had already developed." Pl.'s Reply at 4; *see also id.* at 4–5. The records at issue in *Krikorian*, however, did not discuss a proposed change in agency policy. Rather, they debated the agency's public response to a communication that stood in tension with a pre-existing agency policy. *Krikorian*, 984 F.2d at 463. The decision in question, then, concerned the agency's strategic communications response to a public relations debacle, not whether the agency should alter the underlying policy. As such, the *Krikorian* decision does not stand for the proposition urged by plaintiff that records formulating a communications strategy about an

adopted agency policy are *per se* outside the purview of Exemption 5's deliberative process privilege.

The other D.C. Circuit cases plaintiff cites are equally inapposite. *See* Pl.'s Reply at 3–4. For example, *Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006), found only that the agency's "failure to provide an adequate explanation" for its withholding of documents post-dating an agency decision "prevent[ed] [the Court] from determining whether every piece of [postdated] correspondence . . . constitutes a new final agency action" within the privilege's scope, *id.* at 151. Similarly, the *Coastal States* Court determined that memoranda to agency staff providing "straightforward explanations of agency regulations in specific factual situations" were not protected by the privilege. 617 F.2d at 868. In those cases, the disputed records contained factual descriptions of an already-adopted agency policy rather than discussion about how best to communicate such descriptions, and thus did not implicate the purposes of the privilege.

Likewise, plaintiff points to *Jordan v. Department of Justice*, 591 F.2d 753 (D.C. Cir. 1978) (en banc), a decision in which the en banc Court considered whether portions of a staff manual and an internal agency memorandum providing guidelines for Assistant U.S. Attorneys on how to handle issues related to certain low-level offenses and pretrial diversion were exempt from disclosure under the deliberative process privilege, *id.* at 757–58. In the course of determining that these records were neither predecisional nor deliberative, and therefore did not qualify for exemption, the *Jordan* Court noted that "a communication promulgating or implementing an established policy [is] not privileged." *Id.* at 774. This statement, made in reference to documents for which "[t]he substantive content . . . ha[d] already been determined" and therefore "represent[ed] the promulgation and implementation of polices that ha[d] [a]lready been adopted," *id.* at 775, is not dispositive of the privilege's application to an agency's

formulation of public statements.  Preliminary drafts of such public statements are not merely explanations of substantive agency policy.  Formulation of an agency's public or external communications may reflect development of the agency's agenda, goals, or strategy with regard to certain substantive policies, and thus may be both predecisional and deliberative with respect to the agency's public relations decisions.

Contrary to plaintiff's position, then, a set of talking points or similar document, even if focused on an agency's external presentation of a past policy decision, *may* fall within the scope of the deliberative process privilege.  As EPA puts it, these records may be "predecisional as to what is ultimately communicated by EPA and deliberative because [they] reveal[] the decision-making among staff concerning how best to convey EPA's position on certain topics, or what a specific policy means in a particular context, or how a policy will be implemented in a specific circumstance."  Def.'s Reply at 7.  This general principle notwithstanding, the agency's obligation to show that each of its withholdings of records reflecting deliberations about external communications satisfies the exemption's criteria, described *supra* Part III.B.1, remains.  *See, e.g.*, *Leopold*, 442 F. Supp. 3d at 277 ("[I]n order [for internal agency deliberations about public statements] to receive the protection of FOIA Exemption 5 through the deliberative process privilege, defendant agencies must still provide 'context about the particular press-related deliberations at issue and cannot rely solely on conclusory labels.'" (quoting *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 172)).

In short, the categorical approach urged by plaintiff to exclude from the deliberative process privilege agency records of talking points, though attractive in its simplicity of application, is an overreach, and the harder job of reviewing of each document in context is required.

### *(ii)* *Final Talking Points Are Neither Predecisional Nor Deliberative*

Finally, plaintiff briefly raises the issue of whether any of the talking-points records withheld by EPA "were . . . adopted by EPA or used in its dealings with third parties," such that the documents would lose their potentially exempt status because they would reflect a final agency decision rather than the give and take of the deliberative process.  Pl.'s Opp'n at 20 (citing *Coastal States*, 617 F.2d at 866; *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004)).  Plaintiff rightly asserts that "Exemption 5 does not apply 'if an agency chooses *expressly* to adopt or incorporate by reference' a [document] that would otherwise have been protected by the deliberative process privilege." *Elec. Frontier Found. v. Dep't of Justice*, 739 F.3d 1, 10 (D.C. Cir. 2014) (emphasis in original) (quoting *Sears, Roebuck & Co.*, 421 U.S. at 161)).  This logic is supported by the deliberative process privilege's goal of ensuring that "the writer [of a draft] . . . know[s] at the time of writing that the privilege will apply and that the draft will remain confidential, in order for the writer to feel free to provide candid analysis." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)).  For this goal to be realized, a government employee writing internal drafts of talking points must be confident that the advice will remain privileged.  *See, e.g.*, *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 376 F. Supp. 3d 47, 70 (D.D.C. 2019) (finding draft talking points that "contain[ed] redline edits and comment bubbles and was later turned into a version of the agency's final position" exempt (internal quotation marks omitted)).  Thus, under this guidance, drafts of talking points that are not forwarded to an agency decisionmaker for use in making a public statement are most clearly exempt.

In contrast, talking points that are shared with agency decisionmakers for actual use in making a public statement are disqualified from exemption because they have become final

rather than deliberative.  The version of a set of talking points that is given by staff to an agency head or other senior official in preparation for an upcoming public communication has been thoroughly vetted by agency staff and is considered ready for use by that individual in actually communicating with the public.  Absent evidence that the official who received the talking points made subsequent revisions, declined to use them, or otherwise rejected their view of what to communicate to a particular audience, that last document is the endpoint of agency debate as to the content and format of its public communication on a specific issue or in a particular venue. A talking-points document that is attached to a calendar entry for an event at which an official is expected to speak, or for a scheduled meeting or call, therefore presumptively reflects the agency's final decision as to what information to share and how to share it.

Some Judges on this Court have found that, even if an agency decisionmaker uses a final set of talking points to deliver public remarks, the talking points themselves remain predecisional and deliberative because the official may not stick to the script, or may closely follow the talking points without formally adopting their reasoning.  *See, e.g.*, *Leopold*, 442 F. Supp. 3d at 285 (allowing the withholding of "proposed talking points" that "were crafted by lower-level subject matter experts for [a] more senior official's preparation and potential use" (internal quotation marks omitted)); *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 174 (concluding that even final talking points remain predecisional and deliberative because "given that talking points are typically used on the fly, it would rarely be the case that an official formally adopts" them and "a simple comparison of the talking points with the official's public remarks would reveal the agency's deliberations" (internal quotation marks and citation omitted)); *Judicial Watch, Inc.*, 337 F. Supp. 2d at 173–74 (finding exempt talking points "prepared by [agency] employees for the consideration of [agency] decision-makers").

This conclusion appears to follow from decisions of this Circuit holding that "a recommendation does not lose its predecisional or deliberative character simply because a final decisionmaker later follows or rejects it without comment" and that "the deliberative-process privilege protects recommendations that are approved or disapproved without explanation." *Machado Amadis*, 971 F.3d at 370 (citing *Renegot. Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 185 (1975))).  That rule, however, is best understood in the context in which it originated, of agencies seeking to withhold staff recommendations made in more traditional formats such as briefing documents, policy memoranda, or standard forms, as its application in *Machado Amadis v. Department of State*, 971 F.3d 364 (D.C. Cir. 2020), demonstrates.  The agency in that case produced, in response to plaintiff's FOIA request, a series of "Blitz Forms," documents used to adjudicate FOIA appeals, with redactions under the deliberative process privilege.  *Id.* at 369–71.  The panel concluded that just "because fields provided for reviewer comments and attorney follow-up remained blank" did not transform the staff recommendations included in the otherwise-completed forms into final decisions.  *Id.* at 370.  Without some explicit indication that the recommendations were either accepted or rejected, the panel determined that the forms had been "approved or disapproved without explanation" and therefore remained presumptively deliberative.  *Id.*  The final decision of the agency with respect to a FOIA appeal, however, remains subject to FOIA, even though the underlying "Blitz Form" is exempt from disclosure.

As applied to records such as those contested in *Machado Amadis*, the rule of explicit adoption by an agency aligns with the goals of the deliberative process privilege by shielding all but the final decision of an agency from disclosure.  The rule also conforms to FOIA's broader purpose of promoting transparency because recommendations made in these traditional formats

will either result in a final decision that is itself subject to FOIA or will culminate in no decision at all and remain exempt.  That documents reflecting or commenting upon a final decision remain subject to disclosure thus effectively balances the privilege against FOIA's overall goal of disclosure.

As applied to final talking points, however, a rule that deems such records as mere recommendations about what a decisionmaker should say undermines FOIA's larger aims by effectively allowing an agency to withhold all records related to its public communications and protecting even final decisions from public view.  If final talking points intended for use for an agency decisionmaker are exempt from disclosure, in the event that a scheduled public appearance does not happen, or that the talking points were prepared for a private event or a meeting between agency officials and external stakeholders or elected officials, there exist no "public remarks," *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 174, through which the public can learn what information the agency ultimately chose or meant to share.  As a result, the agency's final decision as to the content and strategy of its public communications remains a mystery, contrary to FOIA's aim of "promot[ing] the broad disclosure of Government records." *DiBacco I*, 795 F.3d at 183 (internal quotation marks and citation omitted).  In contrast, requiring disclosure of final talking points, that is, documents considered by the agency to be ready for use by an agency official in making a public statement, both protects the give-and-take process through which the agency developed the talking points and furthers FOIA's ultimate goal of transparency.

Moreover, that an agency official might extemporize some portion of her remarks while relying on a final set of talking points does not alter the finality of the agency public relations decisions that the talking points reflect.  Final talking points taken up to the podium are the

agency's determination of what information should be shared and how to share it.  The remarks actually delivered by the speaker may represent an additional agency decision—the decision to abandon or change the strategy set forth in the talking points—but do not render the final talking points mere recommendations rather than a considered agency decision.  Regardless of whether or how they are ultimately used, then, final talking points and similar documents memorialize the agency's final decision about its public relations strategy with regard to a particular event or topic and are therefore neither predecisional nor deliberative.

Further, considerations of administrative and judicial workability weigh in favor of finding final talking points to fall outside the scope of the privilege.  Even those decisions that consider final talking points to be exempt from disclosure leave open the likelihood that, were an agency official to read a speech or set of talking points word-for-word in giving public remarks, the decisionmaker would have formally adopted that version of his or her statement.  In such a case, the document memorializing the official's public statement verbatim would become disclosable as a final agency decision.  *See, e.g.*, *Leopold*, 442 F. Supp. 3d at 284 (implying that "whatever [statement] was provided publicly" by the head of an agency and any "transcripts or summaries or statements actually made by him" would be subject to disclosure (alteration and internal quotation marks omitted)); *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 174 (suggesting that "a verbatim recitation" of talking points would render them non-exempt).  Consequently, under a rule holding final talking points generally exempt unless recited verbatim and thus formally adopted by an agency official, an agency responding to a FOIA request that seeks talking points would have to evaluate whether and to what extent an agency decisionmaker relied upon each requested set of talking points in order to justify its withholdings.  This

administrative burden would prove unmanageable in the face of regular personnel changes and the volume of FOIA requests processed by agencies.

A rule of "exempt unless recited verbatim" would also require reviewing courts to assess the degree of variation between a final set of talking points withheld by an agency and the public statement made by an agency decisionmaker in reliance on the withheld material.  Taken to its logical end, such a rule could be understood to mean that a decisionmaker's omission of a single word or phrase stands in the way of disclosure, undermining the goals of FOIA while doing little to promote the interests protected by the deliberative process privilege.  To avoid such absurd results, courts would be called upon to decide how much variation between a final set of talking points and a public statement by an agency results in protection.  The arbitrary line-drawing that would inevitably result from this exercise would result in a frustrating degree of unpredictability for both agencies seeking to comply with their obligations under FOIA and requesters seeking to obtain information about agencies' public and external communications.

In contrast, a rule under which final talking points provided to an agency decisionmaker for actual use in making a public statement not only provides clear guidance to agencies and requesters, but also strikes a more evenhanded balance between the interests protected by the deliberative process privilege and FOIA's overarching goal of transparency.  Thus, if the context surrounding a final talking-points document indicates that it was provided to an agency decisionmaker for actual use in a public communication as the agency's representative, the document is not protected under Exemption 5's deliberative process privilege.

### (iii)   *Application of Deliberative Process Privilege to Talking Points at Issue*

Against this backdrop, EPA's explanation for the withholding of each of the challenged talking points and briefing documents is considered.  First, EPA asserts the deliberative process

privilege to withhold portions of a July 11, 2018 calendar entry containing "preparation notes for

an upcoming meeting between Administrator Wheeler and Australian Minister [of the

Environment and Energy] Josh Frydenberg," an event consisting of a bilateral meeting followed

by the public signing of a memorandum of understanding.  *Vaughn* Index at 7.  The redacted

notes are described as featuring "information about plans for a briefing for the Administrator and

highlight[] changes that have been made to certain briefing materials."  *Id.*  According to EPA,

the withheld material reflects internal discussions about "how best to prepare Administrator

Wheeler and other relevant senior leaders for the meeting," White Decl. ¶ 52, and contains

"preliminary thoughts about potential topics for discussion, meeting invitees, and elements of a

briefing package, that were considered as part of the Agency's decision-making process

concerning preparation for the meeting," *Vaughn* Index at 7.  This material is predecisional, in

that the notes and the briefing documents they describe were prepared and sent to former

Administrator Wheeler ahead of the meeting with Minister Frydenberg, which was scheduled for

July 12, 2018.  *See Vaughn* Index at 14.  EPA has adequately identified the deliberative process

involved (preparations for the Administrator's upcoming meeting with a foreign official), the

role the withheld sections of the document played (presenting options for discussion during the

meeting), and the nature of the decisionmaking authority of the authors of the document (EPA

staff charged with readying the agency head and other senior leaders for the meeting).  The notes

were properly withheld.

Likewise, EPA withheld portions of the "Key Messages" and "Background" sections, and

withheld in full the "Talking Points" section, of a nine-page internal briefing document, provided

to Administrator Wheeler and other senior EPA leaders as a calendar attachment in preparation

for this same July 12, 2018 meeting with Minister Frydenberg, titled "Bilateral Meeting and

MOU Signing with Minister for the Environment and Energy Josh Frydenberg." *Vaughn* Index at 14–15 (referring to the document by Bates No. 17459). EPA asserts that the document was used by EPA staff "to brief the Administrator, and other senior leaders, on the upcoming meeting and to facilitate decision-making on the content of the remarks the Administrator may offer while participating in the bilateral meeting and MOU signing." *Id.* at 14. According to the agency, the withheld information "reflects opinions and suggestions from staff on what Agency leaders should consider in preparing for the meeting and, additionally, talking points that the Administrator could use as part of his remarks." *Id.* With the exception of the "Talking Points" section, much the same analysis applies to information withheld from this document: it is predecisional because the recommendations were sent before the meeting, and deliberative because it reflects agency staff's preparations for and suggestions regarding the content of a meeting between the Administrator and his foreign counterpart.

Plaintiff challenges EPA's withholdings from this document on the grounds that "EPA does not state that this briefing paper was designed to formulate policy rather than to discuss the decision already reached" and that the decision "to sign a memorandum of understanding . . . was made well in advance and certainly not on the spot at the signing ceremony." Pl.'s Opp'n at 19. As explained above, however, the deliberative process of which this document is a part is not whether or not to sign a memorandum of understanding, but rather how to communicate the decision to sign the memorandum to the public. Further, EPA represents that the document includes not only talking points for the signing ceremony, but also strategic considerations for the Administrator's private meeting with Minister Frydenberg. *See Vaughn* Index at 14–15. The determination of what information should be shared with a foreign official is a privileged agency decision. *See, e.g.*, *Leopold*, 442 F. Supp. 3d at 285–86 (holding that draft talking points

"concerning proposed statements to be made to foreign officials" fell within the scope of the privilege (internal quotation marks omitted)), *Elec. Frontier Found. v. Dep't of Justice*, 890 F. Supp. 2d 35, 48–49 (D.D.C. 2012) (finding exempt communications between U.S. negotiators discussing next steps for conversations with their European Union counterparts). EPA has adequately shown that portions of the "Key Messages" and "Background" sections were appropriately withheld from this document.

As to the "Talking Points" section, EPA's *Vaughn* Index suggests that these particular talking points were intended for Administrator Wheeler's direct use in making remarks at the signing ceremony. *See Vaughn* Index at 14–15. They therefore reflect a final agency decision as to what the Administrator should say. As a result, the "Talking Points" are neither predecisional nor deliberative and are not exempt from disclosure.

Next, EPA invokes the deliberative process privilege to explain its withholdings from a four-page internal briefing document about an official celebration of the Emperor of Japan's birthday, held at the Ambassador of Japan's residence, that former Administrator Wheeler was scheduled to attend. *Vaughn* Index at 11–12 (referring to the document by Bates No. 05385). The agency withheld only an attachment to the document that is described as outlining suggested talking points for the Administrator's remarks at the event. *Id.* at 11. EPA asserts that "EPA staff used the document to brief the Administrator on the details of the celebration and facilitate his decision-making as to what remarks he may offer while attending the event," and that the withheld information provided "opinions and thoughts from staff on . . . suggested talking points that the Administrator could consider during his remarks." *Id.*

Plaintiff argues that "what to say at someone's birthday party is not a cognizable policy decision for deliberative process privilege purposes." Pl.'s Opp'n at 20. This argument misses

the mark.  Comments made by Administrator Wheeler in his official capacity at an official event, whether celebrating a birthday or marking an occasion considered less frivolous by plaintiff, constitute public statements by the agency, discussions of which fall within the scope of the privilege.  *See, e.g.*, *Am. Ctr. for Law & Justice v. Nat'l Sec. Agency*, 474 F. Supp. 3d 109, 133–34 (D.D.C. 2020) (concluding that drafts and discussions of and proposed edits to U.N. Ambassador's commencement speech at a university and remarks upon receiving a prize for her work were deliberative and covered by the exemption).  Nonetheless, EPA has not adequately shown that the withheld information was related to a deliberative process.  The talking points were given to Administrator Wheeler for him to use in giving remarks at an official event at a foreign embassy, at which he would be representing EPA.  They therefore are not simply staff recommendations or suggestions to the Administrator, but rather a reflection of the agency's considered judgment as to the content of Administrator Wheeler's speech.  These talking points, too, are a final agency determination, neither predecisional nor deliberative, and thus are not exempt from disclosure.

EPA further claims that the privilege shields from disclosure portions of five documents, described as "suggestions for discussion topics and talking points for upcoming . . . phone calls with various senators and state officials."  Def.'s Mem. at 15.  The first withheld document consists of an internal briefing document for a scheduled phone call between Administrator Wheeler and Senator Tom Carper, from which document EPA withheld sections on "Potential Areas of Concern" and "Proposed Talking Points."  *Vaughn* Index at 16–17 (referring to the document by Bates No. 17552).  EPA staff provided this document to the Administrator to "craft[] a strategy for how Administrator Wheeler could respond to inquiries or potential topics of discussion raised during the call by the Senator."  *Id.* at 16.  Three of the five withheld

documents are internal memoranda from Christian Palich, "a former senior adviser," to

Administrator Wheeler, provided for "the Administrator to review in order to prepare him for . . .

telephone call[s]" with Senators John Cornyn, Tom Udall, and Lisa Murkowski. *Id.* at 19–20

(referring to the Cornyn document by Bates No. 17727), 20–21 (referring to the Udall document

by Bates No. 17816), 23–24 (referring to the Murkowski document by Bates No. 17961). EPA

withheld sections on "Topics for Discussion," which were written "to prepare [the

Administrator] for potential topics of discussion, and to provide him with talking points on those

potential points of discussion," from each document. *Id.* at 19, 20, 23. The last of the five

disputed documents is an internal memorandum from Preston Cory, "a special adviser," to

Administrator Wheeler, "provided . . . to the Administrator to review in order to prepare him for

a telephone call with" Governor Kim Reynolds. *Id.* at 21–22 (referring to the document by Bates

No. 17838). EPA withheld sections titled "Purpose" and "Topics for Discussion," which

sections were written "to prepare [the Administrator] for potential topics of discussion, and to

provide him with talking points on those potential points of discussion." *Id.* at 21.

Based on EPA's descriptions, all five documents contain "drafted talking points . . . to

facilitate the Administrator's decision-making as to what remarks to offer" during his calls with

elected officials. White Decl. ¶ 60. Once again, these documents are neither predecisional nor

deliberative because they were shared with former Administrator Wheeler for his use in a

scheduled call, *see id.* ¶ 61; *Vaughn* Index at 16, 19, 20, 21, 23, and therefore represent the

agency's actual decision as to the content of his conversations. Though EPA submits that the

withheld sections "reflect[] the personal opinions and thoughts of staff working on preparing the

Administrator" for the calls and "tasked with providing him with suggested talking points" and

were drafted by EPA staff, including a senior adviser and a special adviser to the Administrator,

for use by the Agency's most senior official, White Decl. ¶ 60, EPA provides no indication that these talking points were subject to any further revision.  To the contrary, all evidence indicates that these talking points were intended for Administrator Wheeler's actual use during the calls. The documents were theoretically subject to revision by the Administrator upon review, but the fact that they were attached to calendar entries for the calls, rather than to entries for internal briefings scheduled in advance of the calls, indicates strongly that these were final talking points, meant for the Administrator to rely on while speaking to elected officials.  As such, the withheld sections memorialize EPA's decision as to the information that the Administrator should share and the positions he should communicate in conversations with elected officials as the agency's representative, and are not exempt from disclosure.[9]

EPA last asserts the privilege with respect to portions of an internal briefing document, prepared for Administrator Wheeler, "on a scheduled interview with the *Washington Examiner*." *Vaughn* Index at 22 (italics added) (referring to the document by Bates No. 17919).  This record is described as including "details related to the interview, a short biography of the journalist that was scheduled to be conducting the interview, and EPA staff's outline of potential topics that may be covered and suggested talking points."  *Id.* at 22.  The agency withheld only the last of these three sections: the outline of potential topics and suggested talking points.  *Id.*  The withheld section "was generated to brief Administrator Wheeler" in advance of the interview and

---

[9]  Plaintiff asserts that the deliberative process privilege does not apply to any of these documents because "none of these people [the elected officials with whom the calls were scheduled] have responsibility for setting EPA policy, and it appears that the conversations merely focused on policy decisions EPA had already made."  Pl.'s Opp'n at 18.  This argument once again fails, as an agency's deliberations over "how to communicate with members of Congress . . . and how to prepare for potential points of debate or discussion" fall within the scope of the privilege.  *Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100, 120 (D.D.C. 2014) (omission in original) (emphasis and internal quotation marks omitted) (holding an agency's materials related to upcoming calls and meetings with Senators exempt under the deliberative process privilege); *see also Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Lynch*, 156 F. Supp. 3d 101, 111–12 (D.D.C. 2016) (finding that the privilege extends to "internal deliberations about how to respond to press and Congressional inquiries").

"reflects the person opinions and thoughts of staff working on and preparing Administrator

Wheeler for the interview," in order to "craft[] a strategy for how Administrator Wheeler could

respond to questions or potential topics of discussion raised." *Id.* The document as a whole was

designed for the Administrator to "review . . . before making final decisions as to how he would

respond to questions or potential topics of discussion . . . during the interview." *Id.* EPA has

thus adequately identified the deliberative process involved (internal deliberations about the

content to be shared during a press interview of the agency's head); the role the withheld section

of the document played in presenting options and suggestions to Administrator Wheeler; and the

nature of the decisionmaking authority of the authors of the document (EPA staff tasked with

preparing the Administrator for the interview).  Again, however, the fact that these talking points

were attached to a calendar entry for the interview itself provides strong evidence that they were

intended for Administrator Wheeler's use during the interview, without further revision, and

therefore reflect agency guidance as to the Administrator's public comments to the *Washington

Examiner.*  These talking points, too, are final rather than predecisional and deliberative, and

must be disclosed.

In short, the talking points and similar information withheld from these documents are

not exempt from disclosure under the deliberative process privilege because they appear to be

final talking points, intended for Administrator Wheeler's actual use in making public remarks

on EPA's behalf.  This information must be produced.

### c)      NEC Meeting Agenda

The last record for which EPA asserts the deliberative process privilege is described as an

"an agenda . . . internal to the federal government [which] was used to prepare for an upcoming

meeting with the National Economic Council (NEC) and representatives of several agencies"

attached to a calendar entry. *Vaughn* Index at 15 (referring to the document by Bates No. 17471). EPA withheld this document in full, claiming that it "contains a list of topics to be discussed at the upcoming meeting" between the NEC and invited deputy-level officials from several agencies, including EPA. *Id.*; *see also* White Decl. ¶ 65; Def.'s Reply at 8. EPA asserts that the agenda was drafted in advance of the scheduled meeting, to "prepare[] meeting participants for the decisions to be made at the upcoming meeting," *Vaughn* Index at 15; *see also* White Decl. ¶ 65, and was used as "part of the interagency process of collaborating to solve a number of issues important to the federal government" related to "U.S. and global economic policy," *Vaughn* Index at 15; *see also* White Decl. ¶ 65.

Although plaintiff insists that this document is best characterized as "a bare list of topics in an agenda for a meeting," the disclosure of which "would not expose any deliberations," Pl.'s Opp'n at 22 (internal quotation marks omitted); *see also* Pl.'s Reply at 6–7, preliminary meeting agendas that reflect staff recommendations for topics of discussion may be deliberative in nature and therefore exempt, *see, e.g.*, *Ctr. for Pub. Integrity v. FEC*, 332 F. Supp. 3d 174, 180 (D.D.C. 2018) ("A meeting agenda prepared before the meeting is necessarily predecisional and inherently deliberative in that staff are suggesting the topics to be discussed at the meeting."); *Pub. Emps. for Env'tl Resp. v. Off. of Sci. & Tech. Pol'y*, 881 F. Supp. 2d 8, 15–17 (D.D.C. 2012) (finding that "meeting agendas" for an intra-agency working group fell within the scope of the privilege). EPA has not shown, however, that this meeting agenda qualifies for exemption. First, the agency does not identify the author(s) of the document, and does not even claim that the agenda originated within EPA. Crucial information is therefore missing to determine the role this document played, if any, in the interagency collaboration to which EPA asserts that the document relates. Second, while EPA does represent that the agenda was prepared before the

NEC meeting, *Vaughn* Index at 15; White Decl. ¶ 65, the agency is silent as to whether the agenda is a final agenda, representing a firm decision about topics to be discussed, or a preliminary agenda, subject to revision by former Administrator Wheeler or other senior officials.  EPA is clear that, at the time the agenda was written, "no final decisions had been made about any of the policy issues discussed in the document," Def.'s Reply at 9, but this statement does not answer the question of whether the agenda precedes in time the final decision about which policy issues would be discussed at the NEC meeting.  EPA has not adequately shown that the NEC meeting agenda is either predecisional or deliberative.

*     *     *

EPA has shown that information was properly withheld under Exemption 5 from the three briefing documents discussed *supra* Part III.B.1.a (Bates Nos. 04639, 05410, and 05438), the July 11, 2018 calendar entry discussed *supra* Part III.B.1.b.iii (*Vaughn* Index at 7), and the redacted "Key Messages" and "Background" sections of the briefing document with Bates No. 17459, discussed *supra* Part III.B.1.b.iii.  In contrast, EPA has not justified its withholdings of talking points and related information in the calendar attachments discussed *supra* Part III.B.1.b.iii (Bates Nos. 05385, 17459, 17552, 17727, 17816, 17838, 17919, and 17961), and must produce the redacted information, consistent with this Memorandum Opinion.  As to the document discussed *supra* Part III.B.1.c (Bates No. 17471), EPA has not provided sufficient information to determine whether its withholdings are justified, and must either produce the withheld information or supply additional information about its use that might justify the agency's withholdings pursuant to the deliberative process privilege.

### 2.      *Information Withheld Pursuant to Exemption 6*

Plaintiff next challenges EPA's withholdings pursuant to FOIA Exemption 6, which exempts from disclosure "personnel and medical files and similar files the disclosure of which

would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

"FOIA's strong presumption in favor of disclosure is at its zenith in th[e] Exemption 6 analysis."

*Jurewicz v. Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (internal citations and

quotation marks omitted).

Review of personal privacy withholdings under Exemption 6 proceeds in stages.  The

first stage requires the Court to "'determine whether the [records] are personnel, medical or

similar files covered by Exemption 6.'"  *AILA*, 830 F.3d at 673 (alteration in original) (quoting

*Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008)).  If the records

are such files, at the second stage, the Court then must "determine whether their disclosure

would constitute a clearly unwarranted invasion of privacy."  *Id.* (internal quotation marks and

citation omitted).  This stage requires "another two-step process," which considers first whether

"'disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest.'"  *Id.*

at 673–74 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)).

The burden of showing that disclosure will injure a substantial privacy interest lies with the

government.  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (citing

*Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984)).  For purposes of the

Exemption 6 analysis, "[t]he privacy interest at stake belongs to the individual, not the

government agency."  *Ford v. Dep't of Justice*, 208 F. Supp. 3d 237, 250 (D.D.C. 2016); *accord*

*Dep't of Justice v. Reps. Comm. for Freedom of Press* ("*Reps. Comm.*"), 489 U.S. 749, 763–65

(1989).  A substantial privacy interest is "anything greater than a *de minimis* privacy interest,"

*Multi Ag Media LLC*, 515 F.3d at 1229–30, but the weight of the "privacy interest at stake may

vary depending on the context in which it is asserted," *AILA*, 830 F.3d at 675 (internal quotation

marks and citation omitted); *see also Bartko v. Dep't of Justice*, 898 F.3d 51, 69 (D.C. Cir.

2018).  "'[I]f no significant privacy interest is implicated . . . FOIA demands disclosure.'" *Multi Ag Media LLC*, 515 F.3d at 1229 (omission in original) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)).

If, on the other hand, disclosure would infringe a substantial privacy interest, the privacy interest must be balanced "'against the public interest in the release of the records.'" *AILA*, 830 F.3d at 674 (quoting *Nat'l Ass'n of Home Builders*, 309 F.3d at 33).  Only one public interest is relevant: "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations of activities of the government*.'"  *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994) (emphasis and alteration in original) (quoting *Reps. Comm.*, 489 U.S. at 775).  "In other words, disclosure of government records under FOIA is meant to help the public stay informed about 'what their government is up to.'"  *AILA*, 830 F.3d at 674 (quoting *Reps. Comm.*, 489 U.S. at 773).  The agency carries the burden of establishing that any withheld records meet the statutory balancing test.  *See id.* at 673.

EPA has applied Exemption 6 to withhold information in thirteen calendar entries, ranging in date from July 5, 2019 to March 30, 2019, "contain[ing] the locations at which the Administrator ate lunch or dinner," *Vaughn* Index at 2; *see also* White Decl. ¶ 43, and information in two calendar entries, dated February 14, 2019 and March 25, 2019, consisting of "information related to [Administrator Wheeler's] train or flight reservations (i.e., specific ticket or route numbers) and the names of hotels at which the Administrator stayed while traveling," *Vaughn* Index at 2–3.  At the first stage, "[s]imilar files" covered by Exemption 6 "include 'detailed Government records on an individual which can be identified as applying to that individual,'" *Prison Legal News*, 787 F.3d at 1146–47 (quoting *Judicial Watch, Inc. v. Dep't of*

*Justice*, 365 F.3d 1108, 1124 (D.C. Cir. 2004)), and encompass "'not just files, but also bits of personal information, such as names and addresses, the release of which would create[] a palpable threat to privacy,'" *id.* at 1147 (alteration in original) (quoting *Judicial Watch, Inc.*, 449 F.3d at 152); *see also Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (holding that all information that "applies to a particular individual" satisfies the threshold requirement for Exemption 6 coverage). Administrator Wheeler's calendar entries are "files" within the meaning of Exemption 6 because "[t]hey are detailed government records about [Administrator Wheeler] that, if released, would be identified as applying to him." *E.G. v. Dep't of Air Force*, 302 F. Supp. 3d 230, 235 (D.D.C. 2018). Plaintiff does not contest this conclusion. *See* Pl.'s Opp'n at 27–29; Pl.'s Reply at 9–11.

At step two, EPA contends that releasing the locations at which Administrator Wheeler ate lunch or dinner and the particulars of his travel arrangements "would constitute a clearly unwarranted invasion of personal privacy and could lead to harassment as well as unwanted contact by the media and others," Def.'s Mem. at 19; *see also* Def.'s Reply at 13–15, especially because the Administrator may frequent the same restaurants in Washington, D.C., or "repeatedly use similar travel routes and stay in similar hotels," *Vaughn* Index at 2–3; *see also* White Decl. ¶¶ 42–43. Plaintiff answers that this privacy interest is "wholly speculative," and further, that the passage of time since March 30, 2019 (the date of the last relevant calendar entry) "reduces the reasonableness of any espoused privacy concerns arising from disclosure of these wholly past, completed actions." Pl.'s Opp'n at 27–28; *see also* Pl.'s Reply at 9–11.

As to plaintiff's first argument, that Administrator Wheeler's alleged privacy interest in the withheld information is "wholly speculative," Pl.'s Opp'n at 27, EPA asserts, as a general matter, that "it is axiomatic that certain employees or officials in sensitive positions or who work

at certain agencies may face an increased risk of harassment or unwanted contact," Def.'s Reply

at 13 (citing *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012); *Judicial Watch, Inc.*,

449 F.3d at 153; *Armstrong v. Exec. Off. of President*, 97 F.3d 575, 582 (D.C. Cir. 1996)).  EPA

doubles down on this assertion in a supplemental declaration claiming that "[m]edia reports

demonstrate that politically motivated harassment of government officials in public spaces is a

reality, and that these incidents have occurred regularly in recent years, especially in dining

establishments," noting that "Administrator Wheeler's immediate predecessor had a meal

disrupted at a Washington, D.C. restaurant."  Suppl. White Decl. ¶ 4; *see also id.* (further

asserting that "[a]s a cabinet level official, Administrator Wheeler faces an increased risk of

harassment from the media and from politically motivated individuals when he is in public

spaces," a risk that would be "exacerbate[d]" by disclosure of the withheld material).  Likewise,

as to plaintiff's second argument, that the passage of time since Administrator Wheeler ate at a

particular restaurant or undertook certain travel diminishes his privacy interest in the withheld

information, Pl.'s Opp'n at 27–28, EPA contends that, as of the time of writing on October 5,

2020, "Administrator Wheeler still leads EPA and engages in certain routines, including dining

at restaurants in, or around, downtown Washington, D.C., as well as travel," Def.'s Reply at 14.

Administrator Wheeler left the helm of EPA on January 19, 2021.  *See* EPA, *Chronology*

*of EPA Administrators* (last visited Feb. 12, 2021), https://www.epa.gov/history/chronology-epa-

administrators.  Thus, the context and relevance of the privacy interests EPA asserts in defense

of its Exemption 6 withholdings has changed substantially.  Administrator Wheeler is no longer

a Cabinet-level government official, nor is he "the public face for every action the EPA takes in

fulfilling its mission."  Def.'s Reply at 14.  Rather, Administrator Wheeler is now a private

citizen whose comings and goings two or three years ago are significantly less likely to attract

media attention or harassment than they might have during his tenure in office.  Further, to the extent that Administrator Wheeler's repeated visits to certain restaurants or use of certain travel routes or accommodations were associated with his role as Administrator, concerns about disclosure leading to "harassment as well as unwanted contact by the media and others" may be lessened.  Def.'s Mem. at 19.  EPA does not point to any privacy interests held by the Administrator in his personal capacity, aside from a *de minimis* interest in "not having one's dietary preferences published," *Vaughn* Index at 2, relying instead on those privacy interests associated with his former, public-facing position.  *See* Def.'s Mem. at 19; Def.'s Reply at 13–15.  Even if Administrator Wheeler remained in office, the general interest of a Cabinet-level official in avoiding harassment or unwanted contact that EPA asserts is best understood as a security interest rather than a personal privacy interest, given the inherently public nature of Cabinet members' positions and official duties.  Finally, the records reflect visits to restaurants and travel that occur in public spaces subject to observation by the public, significantly reducing any privacy interest that might attach.  EPA has therefore failed to raise a substantial privacy interest with respect to the withheld information.  In the absence of such an interest, no further inquiry is necessary, and EPA must disclose this information.  *See Multi Ag Media LLC*, 515 F.3d at 1229.  Summary judgment as to these records is granted for plaintiff.

### 3.    *Information Withheld Pursuant to Exemption 7(C)*

Third, plaintiff disputes EPA's withholding from thirty calendar entries, ranging in date from July 10, 2018 to March 27, 2019, of information consisting of the names and email addresses of agents who provided protection to former Administrator Wheeler as part of his Personnel Security Detail ("PSD").  *See Vaughn* Index at 5–6; White Decl. ¶¶ 44–47.  The PSD "is comprised of Criminal Investigators from" EPA's Office of Criminal Enforcement, Forensics, and Training ("OCEFT") "who are assigned to protect to the health and safety of the

EPA Administrator."  Decl. of Claude Walker ("Walker Decl.") ¶ 3, ECF No. 23-2.  EPA has

asserted both Exemption 6 and Exemption 7(C) with respect to its withholding of this

information.  White Decl. ¶ 47; *Vaughn* Index at 5.  Similar to Exemption 6, Exemption 7(C)

shields from disclosure  "records or information compiled for law enforcement purposes, but

only to the extent" that disclosure "could reasonably be expected to constitute an unwarranted

invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Both Exemption 6 and Exemption 7(C)

"seek to protect the privacy of individuals identified in certain agency records," *ACLU v. Dep't*

*of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011), but textual differences between the two exemptions

mean that "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes

a lower bar for withholding material," *id.* (internal citation and quotation marks omitted);

*compare* 5 U.S.C. § 552(b)(6) (exempting records "disclosure of which would *constitute* a

*clearly unwarranted* invasion of personal privacy" (emphasis added)), *with* 5 U.S.C.

§ 552(b)(7)(C) (exempting records that "could *reasonably be expected to constitute* an

*unwarranted* invasion of personal privacy" (emphasis added)); *see also Nat'l Archives &*

*Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004) (noting that the phrase "clearly

unwarranted" in Exemption 6 creates a higher bar for withholding responsive material than

Exemption 7(C)).

    To qualify for Exemption 7(C)'s more protective treatment, however, an agency must

first "make a threshold showing that the FOIA request seeks records 'compiled for law

enforcement purposes.'"  *Bartko*, 898 F.3d at 64 (quoting *Jefferson v. Dep't of Justice*, 284 F.3d

172, 176 (D.C. Cir. 2002)).  This standard "requires that a document be created, gathered, or

used by an agency for law enforcement purposes at some time before the agency invokes the

exemption."  *Pub. Emps. for Env'tl Resp. v. U.S. Section, Int'l Boundary & Water Comm'n,*

*U.S.-Mexico* ("*PEER*"), 740 F.3d 195, 203 (D.C. Cir. 2014) (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989)).  "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law and includes . . . proactive steps designed to prevent criminal activity and to maintain security."  *EPIC*, 777 F.3d at 522 (emphasis and omission in original) (internal quotation marks and citations omitted).  EPA "does not 'specialize[] in law enforcement,'" even if its OCEFT, from which PSD officers are assigned, does, and therefore "its attempt to shield its records under Exemption 7(C) merits no deference." *Bartko*, 898 F.3d at 64 (alteration in original) (quoting *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)).[10]

If the records are properly characterized as law enforcement records, the agency must next show that "the privacy interest the government asserts . . . outweighs any public interest in disclosure."  *Id.* (citing *Roth v. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)).  Like Exemption 6, Exemption 7(C) aims to "protect the privacy of individuals identified in certain agency records."  *ACLU*, 655 F.3d at 6.  "[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens' right to be informed about what their government is up to.'"  *Davis v. Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Reps. Comm.*, 489 U.S. at 773); *cf. AILA*, 830 F.3d at 674.  The FOIA requester carries the burden "to show . . . that the public interest sought to be advanced is a significant one, and that

---

[10]     Plaintiff, relying on *Bartko* and other D.C. Circuit precedent, contends that, for purposes of the Exemption 7(C) analysis, "[t]o qualify as law enforcement records, the record must arise out of 'investigations which focus directly on specifically alleged illegal acts which could, if proved, result in civil or criminal sanctions.'"  Pl.'s Opp'n at 31 (quoting *Bartko*, 898 F.3d at 64); *see also* Pl.'s Reply at 13–15.  This characterization of the "compiled for law enforcement purposes" standard is overly restrictive, and reads *Bartko* out of context.  The D.C. Circuit in *Bartko* described the standard only as it applied to the records at issue in that case, which were investigatory files.  *See* 898 F.3d at 64.  In fact, the threshold "compiled for law enforcement purposes" inquiry applies to all exemptions set forth under 5 U.S.C. § 552(b)(7), not just Exemption 7(C), nor is Exemption 7(C) limited to records of an investigation.  *See* 5 U.S.C. § 552(b)(7).  As such, many types of records may be considered to have been "compiled for law enforcement purposes."  *See PEER*, 740 F.3d at 203.

the [requested] information is likely to advance that interest." *Bartko*, 898 F.3d at 72 (alteration

in original) (internal quotation marks and citation omitted); *see also Favish*, 541 U.S. at 175

(explaining that the requester must make "a meaningful evidentiary showing" of a public interest

"to balance against the cognizable privacy interests in the requested records").

 Under the standard outlined above, EPA has established that the names and email

addresses of PSD agents assigned to protect Administrator Wheeler, included in thirty calendar

entries, were "compiled for law enforcement purposes."  The agency explains that "the purpose

of the PSD is to ensure the Administrator's security by detecting, preventing, and responding to

potential criminal acts perpetrated against him."  White Decl. ¶ 44; Walker Decl. ¶ 3 (same).

PSD agents accompany the Administrator to events and meetings in a protective capacity,

anticipate and mitigate threats to the Administrator's safety, and assist with sensitive

environmental criminal investigations.  Walker Decl. ¶¶ 3–4, 7.  Each of these functions,

undertaken in agents' capacity as members of the PSD, serves to prevent potential criminal

activity and promote public safety as well as the Administrator's safety.  Calendar records

detailing which PSD agents will carry out these activities on a given date and time are therefore

"compiled for law enforcement purposes."  *See Milner*, 562 U.S. at 582 (Alito, J., concurring)

(The "ordinary understanding of law enforcement includes . . . proactive steps designed to

prevent criminal activity and to maintain security."); *EPIC*, 777 F.3d at 523 (finding that an

emergency protocol passed Exemption 7's threshold test because it "was created to prevent

crime and keep people safe, which qualify as law enforcement purposes").  Accordingly, EPA's

withholding of PSD agents' names and email addresses from these records is evaluated only

under Exemption 7(C), because it "provides broader privacy protection than Exemption 6."

*Citizens for Resp. & Ethics in Wash. v. Dep't of Justice*, 854 F.3d 675, 681 (D.C. Cir. 2017); *see also CREW I*, 746 F.3d at 1091 n.2.

EPA argues that "PSD agents have a significant privacy interest in the continued withholding of their names and email addresses" because "[d]isclosure of their identities, including contact information, could expose them to harassment or danger due to their role providing security to the Administrator." White Decl. ¶ 45; *see also Vaughn* Index at 5. In particular, the agency asserts that PSD agents are "subject to attention from the media and from politically motivated individuals due to the high-profile nature of the protectee," such that "disclosure of PSD members' personal information would expose them to undue attention from individuals seeking information about the Administrator and harassment from individuals seeking to disrupt the Administrator's activities," Walker Decl. ¶ 6, as well as "harassing queries for unauthorized access to information" about "sensitive environmental criminal investigations" to which PSD agents might be assigned, *id.* ¶ 7.

Though plaintiff contends that EPA "fail[s] to provide any reason why the innocuous act of serving on a security detail would be controversial at all, much less likely to draw threats and harassment," Pl.'s Opp'n at 29; *see also* Pl.'s Reply at 11–12, EPA's claim, substantiated by two declarations, that the PSD agents could be subjected to harassment by virtue of the identity of the person they protect and the types of investigations in which they and their colleagues are involved is sufficient to establish an "unwarranted invasion of privacy" for Exemption 7(C) purposes. Rank-and-file government employees, including law enforcement agents, have a clear interest in avoiding harassment by members of the media or the public, as courts in this Circuit have routinely acknowledged.[11] They have an even stronger interest in keeping private their

---

[11]    *See, e.g.*, *Roth*, 642 F.3d at 1174; *Schrecker v. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) ("On the privacy side of the ledger, our decisions have consistently supported nondisclosure of names or other

direct contact information that might facilitate such harassment.  *See, e.g.*, *Hall & Assocs. v. EPA*, Civ. A. No. 19-1095 (RC), 2020 WL 4673411, at *3–4 (D.D.C. Aug. 12, 2020) (finding a privacy interest in privately held email addresses); *Seife v. Dep't of Stat*e, 298 F. Supp. 3d 592, 629 (S.D.N.Y. 2018) (identifying a privacy interest in official government email addresses that are not otherwise publicly available).

The privacy interests of PSD agents must next be balanced "against the public interest in the release of the records."  *AILA*, 830 F.3d at 674 (internal quotation marks omitted).  First, as to the official government email addresses of PSD agents, plaintiff asserts no specific public interest that disclosure of this information would promote, nor it is apparent how public knowledge of PSD agents' email addresses would illuminate EPA's performance of its statutory duties or otherwise inform citizens of EPA's activities.  *See* Pl.'s Opp'n at 29–31; Pl.'s Reply at 11–13.  Plaintiff has therefore failed to show that disclosure of PSD agents' email addresses promotes a significant public interest, and PSD agents' substantial privacy interest in their direct contact information thus outweighs the public interest in disclosure of this information.  *See Bartko*, 898 F.3d at 72; *Consumers' Checkbook, Ctr. for Study of Servs. v. Dep't of Health & Hum. Servs.*, 554 F.3d 1046, 1056 (D.C. Cir. 2009) ("'We have been shown no public interest in . . . disclosure. . . . We need not linger over the balance; something, even a modest privacy

---

information identifying individuals appears in law enforcement records, including investigators[.]"); *Lesar v. Dep't of Justice*, 636 F.2d 472, 487–88 (D.C. Cir. 1980) (concluding that FBI agents' names were not subject to disclosure because agents could face "public exposure or possible harassment"); *Hunton & Williams LLP*, 248 F. Supp. 3d at 257 (finding that Army employees, other than high-ranking officials, "clearly have a substantial privacy interest in avoiding potential harassment"); *Lamb v. Millennium Challenge Corp.*, 334 F. Supp. 3d 204, 216–17 (D.D.C. 2018) ("[G]overnment investigators and employees have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives." (internal quotation marks and citation omitted)); *Michael v. Dep't of Justice*, Civ. A. No. 17-0197 (ABJ), 2018 WL 4637358, at *11 (D.D.C. Sept. 27, 2018) ("[D]isclosure of personal information of law enforcement personnel may hinder the ability to conduct ongoing investigations, may lead to unwarranted harassment, and may otherwise cause embarrassment and constitute the invasion of privacy that is contemplated by the Exemptions."); *Tracy v. Dep't of Justice*, 191 F. Supp. 3d 83, 95 (D.D.C. 2016) (allowing the FBI "to withhold the names of FBI employees" under Exemption 7(C) due to the generalized threat of public harassment).

interest, outweighs nothing every time.'" (quoting *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at

879)); *Hunton & Williams LLP*, 248 F. Supp. 3d at 257 (finding Army employees' government

email addresses exempt from disclosure in part because the plaintiff "d[id] not identify any

public interest in this information").[12]

As to the names of PSD agents, EPA again relies on the privacy interests of these

individuals in remaining free from threats and harassment by individuals "seeking information

about the Administrator . . . [and] seeking to disrupt the Administrator's activities," Walker Decl.

¶ 6, as well as "harassing queries for unauthorized access to information" about "sensitive

environmental criminal investigations," *id.* ¶ 7.  Further, EPA is concerned about "retaliation

against PSD agents involved in investigations" of individuals prior to or simultaneous with their

being assigned to protect the Administrator.  *Id.*; *see also, e.g.*, *Hunton & Williams LLP*, 248 F.

Supp. 3d at 258 (recognizing Army employees' "privacy interest in keeping their names from the

public spotlight" in part because of the threat that they "could become targets of harassing

inquiries for unauthorized access to information" (internal quotation marks omitted)).

---

[12]     Though plaintiff does not set forth any public interest in the email addresses, it does claim that they are not
exempt from disclosure because EPA's online staff directory makes this information readily available to the public.
Of course, "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the
agency has waived its right to claim an exception with respect to that information."  *ACLU v. CIA*, 710 F.3d 422,
426 (D.C. Cir. 2013).  To raise an "official acknowledgment" argument, plaintiff bears the "'initial burden of
pointing to specific information in the public domain that appears to duplicate that being withheld.'"  *Id.* at 427
(quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).  To this end, plaintiff asserts that "[its] counsel . . . was
readily able to identify [similarly situated agents'] email addresses on EPA's publicly available Staff Directory
merely by searching their names."  Pl.'s Opp'n at 30; *see also* Wilcox Decl. ¶ 45.  EPA counters that "the only
reason that [p]laintiff was able to locate [these] agents' email addresses on EPA's staff directory was because
[p]laintiff already knew the names of those individuals" to search on the directory.  Def.'s Reply at 17 n.7.  EPA's
online staff directory allows users to search for EPA employees by first and last name and work location.  *See* EPA,
*Staff Directory* (last visited Feb. 12, 2021), https://cfpub.epa.gov/locator/index.cfm.  "A minimum of the first two
letters of the [employee's] last name must be used" to initiate a search.  *Id.*  Search results do not list individual
employees' job titles, but do include their EPA email addresses.  These features of the online staff directory suggest
that the precise information plaintiff seeks, that is, the identities of particular PSD agents paired with their email
addresses, is not available in the public domain, at least not without prior knowledge of PSD agents' identities.
Indeed, plaintiff's own successful searches were predicated on identification of the relevant agents in court
decisions.  *See* Pl.'s Opp'n at 30; Wilcox Decl. ¶ 45.  Plaintiff has therefore failed to carry its burden to raise an
"official acknowledgment" argument against withholding of the email addresses.

Plaintiff asserts a countervailing public interest in the identities of PSD agents assigned to protect Administrator Wheeler based on an EPA OIG report, produced by the agency in response to the FOIA Request, which found that the cost of former Administrator Pruitt's security detail, "around $3.5 million in his first year alone," represented "a 110 percent increase over the previous period."  Pl.'s Opp'n at 29–30; *see also* Wilcox Decl., Ex. 47, OIG, EPA, Report No. 19-P-0155, Actions Needed to Strengthen Control over the EPA Administrator's and Associated Staff's Travel (2019) ("OIG Report") at 3, ECF No. 20-51.  Plaintiff alleges that Administrator Pruitt's security detail was "three times as large as for previous EPA Administrators," Pl.'s Opp'n at 29 (citing FOIA Request at 19), and that the PSD agents who contributed to this increased detail "were permanently transferred from CID [EPA's Criminal Investigation Division] to Pruitt's security detail 'with no significant responsibilities for investigating environmental crimes'" pursuant to EPA's statutory mandates, *id.* at 30 (quoting OIG Report at 13).  Thus, plaintiff contends, knowing the identities of the transferred PSD agents "would allow the public to assess the effects of these reductions on environmental enforcement actions and to assess whether EPA is still overstaffing the PSD."  *Id.*; *see also* Pl.'s Reply at 12–13.

EPA counters that "PSD payroll and travel costs for the time period of [p]laintiff's request, and prior years, are publicly available on EPA's website," Def.'s Reply at 16; *see also* Walker Decl. ¶ 5, such that disclosure is not necessary for the public interests identified by plaintiff to be satisfied.  EPA is correct that "the availability of the information [sought by a FOIA requester] through other sources" is "relevant to the public interest," *Prison Legal News*, 787 F.3d at 1147, to the extent this publicly available information might reduce the public interest in disclosure for the purpose of facilitating evaluation of EPA's spending.  Without the identities of the PSD agents, however, plaintiff "cannot determine which CID agents were

transferred to the PSD, and therefore taken off of environmental enforcement duties; how that may affect the CID's environmental enforcement abilities; and which statute(s) these PSD agents formerly enforced prior to being reassigned."  Pl.'s Reply at 12.  Even if EPA is correct that "[t]he specific names and email addresses of individual agents . . . offer[] no insight into [the] costs" associated with agents' assignment to the PSD beyond that provided by the cost-related information on its website, Def.'s Reply at 16, the separate public interest in EPA's reallocation of its CID agents for use by the Administrator as PSD agents and the impact of such reallocation on EPA's execution of its statutory duties remains unsatisfied.  Nor is it clear that plaintiff could obtain the information it seeks through any other publicly available means.  Plaintiff has thus stated a cognizable public interest in disclosure of PSD agents' names.

The burden, then, falls on EPA to  "explain[] why disclosure of [PSD agents' names] would . . . be 'reasonably . . . expected to constitute an unwarranted invasion'" of agents' personal privacy, "when balanced against the public interest in disclosure."  *Bartko*, 898 F.3d at 66 (second omission in original) (quoting 5 U.S.C. § 552(b)(7)(C)).  EPA's declarations and *Vaughn* Index make no apparent effort to weigh the public interest in disclosure against PSD agents' privacy interests in nondisclosure of their names.  *See Vaughn* Index at 5–6; White Decl. ¶¶ 44–47.  In its briefing, EPA argues only that, in the "absence of any countervailing public interest," EPA's withholdings are justified, Def.'s Reply at 16, falling far short of its burden under Exemption 7(C).

In any event, the balancing of interests favors disclosure.  Although PSD agents have a strong privacy interest in their identities, EPA appears to routinely release the names of CID and PSD agents for public relations purposes, for example, positive press coverage about CID or PSD agents, *see, e.g.*, Suppl. Decl. of Stuart Wilcox ("Suppl. Wilcox Decl."), Ex. 52, Thomas

Korosec, *Meet the EPA's Top Cop*, D MAG. (Apr. 2012), ECF No. 25-2 (identifying a CID agent by name), and press releases about successful investigations undertaken with CID involvement.[13] Further, EPA does not identify any particularized risk of threat or harassment to PSD agents assigned to protect Administrator Wheeler.  *See, e.g.*, *Hunton & Williams LLP*, 248 F. Supp. 3d at 258 (finding that the public interest in disclosure outweighed Army employees' privacy interest in their names where "the Army d[id] not give any reason to believe that [the employees whose names were redacted] face particular risks" of harassment); *Sierra Club v. EPA*, No. 3:18-cv-03472-JCS, 2020 WL 7240211, at *5 (N.D. Cal. Dec. 8, 2020) (noting that "[w]hile the mere potential for harassment creates a cognizable interest even in the absence of any certainty that harassment would result, . . . [w]here the EPA has offered no reason to believe that the particular individuals at issue in this case would face harassment if their names or email addresses were disclosed, the Court assigns relatively little weight to that potential harm," though declining to determine whether such information is exempt from disclosure (emphasis, internal quotation marks, and citation omitted)); *see also* Pl.'s Notice of Suppl. Authority at 1, ECF No. 26 (pointing to *Sierra Club*, 2020 WL 7240211, for this proposition).

Plaintiff, on the other hand, has identified a significant public interest in tracing EPA's transfer and reallocation of law enforcement agents from investigatory duties within CID to the Administrator's PSD and any "concomitant reduction in enforcement actions at EPA."  Pl.'s Reply at 12.  This interest will be furthered by disclosure of the names of the Administrator's PSD agents because plaintiff, or others, can use this information to determine how many agents

---

[13]     *See, e.g.*, Suppl. Wilcox Decl., Ex. 55, Press Release, U.S. Dep't of Justice, U.S. Att'y's Off., D. Haw., Eleven Defendants Charged in Hawaii Federal Court with Racketeering & Other Offenses (July 15, 2020), ECF No. 25-5 (naming a CID special agent assigned to an investigation that resulted in extensive criminal charges); *id.*, Ex. 58, Press Release, U.S. Dep't of Justice, U.S. Att'y's Off., N.D.N.Y., Former Fulton County Tannery Owner Ordered to Pay Restitution for Clean-up of Hazardous Waste (May 15, 2020), ECF No. 25-8 (naming a CID special agent assigned to an investigation that resulted in a substantial fine).

were shifted from investigation and enforcement to protection.  This is a weighty public interest that will, in part, reveal how EPA functions and how it carries out its statutory duties.  Summary judgment as to these records is therefore granted for plaintiff.

### 4.     *Information Withheld Pursuant to Exemption 7(E)*

Finally, plaintiff contests EPA's withholding, pursuant to FOIA Exemption 7(E), of information in three calendar entries, one from January 4, 2019 and two from different times on January 24, 2019, identifying "the specific room in the White House where a regular meeting concerning clean air fuel economy standards took place."  White Decl. ¶ 49; *see also Vaughn* Index at 4.

Exemption 7(E) protects law enforcement records to the extent disclosure of those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  This "risk of circumvention" standard "'sets a relatively low bar for the agency to justify withholding'" of documents within the statutory categories of law enforcement techniques, procedures, or guidelines.  *PEER*, 740 F.3d at 205 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).  In order to prevail, "an agency must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'"  *Id.* (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  EPA's burden, then, is that of "'demonstrat[ing] logically how the release of the requested information might create a risk of circumvention of the law.'"  *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP*, 562 F.3d at 1194).

Like Exemption 7(C), invocation of Exemption 7(E) requires an agency first to make a threshold showing that the records it seeks to withhold were compiled for law enforcement

purposes.  The D.C. Circuit has found that "'federal building plans and related information—which may have been compiled originally for architectural planning or internal purposes—may fall within Exemption 7 if that information is later compiled and given to law enforcement officers for security purposes.'"  *PEER*, 740 F.3d at 203 (quoting *Milner*, 562 U.S. at 584 (Alito, J., concurring)).  The disputed calendar entries, which include specific locations within the White House where a regular meeting attended by senior government officials is held, might qualify as law enforcement records under this definition, but neither the agency's *Vaughn* Index nor its declarations indicate that the meeting locations were shared or otherwise known by law enforcement officers.  Further, in defense of its determination that these records were compiled for law enforcement purposes, EPA states only that they qualify as such "[d]ue to the high security concerns associated with particular locations in the White House."  *Vaughn* Index at 4; *see also* White Decl. ¶ 49.  Allowing agencies to claim that withheld records are "compiled for law enforcement purpose" because they implicate nebulous "high security concerns," without offering any specification of the law enforcement ends to which the records relate or indeed, any evidence that the records were even used by or made available to law enforcement, would deprive Exemption 7's threshold inquiry of all meaning.

Even if the calendar entries were law enforcement records, EPA has not met its burden to withhold information under Exemption 7(E) because it has not identified a law enforcement technique, procedure, or guideline connected to the redacted room locations or any way in which disclosure of this information would create or enhance a risk of violation of the law.  To merit nondisclosure, "the agency must at least provide *some* explanation of what [law enforcement] procedures are involved and how they would be disclosed."  *CREW I*, 746 F.3d at 1102.  Here, EPA disregards the statutory text's focus on "techniques," "procedures," and "guidelines"

entirely.  Instead, it jumps straight to this Circuit's "risk of circumvention standard," without satisfying the preliminary requirement of explaining how the disputed information is linked to a law enforcement technique, procedure, or policy.  *See* Def.'s Mem. at 21–22; Def.'s Reply at 18.

Nor has EPA carried its burden with respect to the "risk of circumvention" showing.  The agency provides only a barebones justification for its withholding of the room locations, representing that "disclosure would pose operational challenges for security" and therefore "could reasonably be expected to risk circumvention of the law."  *Vaughn* Index at 4; *see also* White Decl. ¶ 49.  Operational challenges, however, do not create or enhance any risk of circumvention of the law in and of themselves.  They may complicate the government's response to or prevention of potential circumventions of the law, and thus indirectly raise the risk of violations, but that interest falls outside the scope of Exemption 7(E), which is trained on the risks that result from the disclosure of information about "law-enforcement techniques and procedures" that would assist a prospective wrongdoer in planning their misconduct.  *Elec. Priv. Info. Ctr. v. Dep't of Justice*, Civ. A. Nos. 19-810 (RBW), 19-957 (RBW), 2020 WL 5816218, at *11 (D.D.C. Sept. 30, 2020) (internal quotation marks and citation omitted); *see also Pinson v. Dep't of Justice*, 243 F. Supp. 3d 74, 80 (D.D.C. 2017) (Exemption 7(E) protects "material that would compromise law enforcement by revealing information about investigatory techniques that are not widely known to the general public." (internal quotation marks and citation omitted)).  Further, the meetings at issue occurred in January 2019, a fact that leaves open the question of whether disclosure of room locations used for meetings more than two years ago would in fact implicate any current law enforcement tactics or introduce a risk of illegal activity today.  In sum, EPA has not connected the dots between the withheld information and the "risk" of circumvention of the law it asserts.  Summary judgment with respect to these records is

therefore granted for plaintiff, and EPA must produce the room locations in the three contested calendar entries.

### C.    Foreseeable Harm

Plaintiff next contends that, even if the disputed records are exempt from disclosure, "EPA has not met its burden" under the FOIA Improvement Act of 2016 "to show that releasing the withheld records [at] issue would cause any cognizable foreseeable harm."  Pl.'s Opp'n at 35; *see also* Pl.'s Reply at 16–20.  The FOIA Improvement Act provides that "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by" one of the nine FOIA exemptions.  5 U.S.C. § 552(a)(8)(A).  This provision requires agencies withholding information under an exemption to show not only that a withheld record "falls within a FOIA exemption," but also that "the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'"  *Machado Amadis*, 971 F.3d at 370 (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

An agency successfully makes this second, "heightened" showing, *Judicial Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019), by "'identify[ing] specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials' and 'connect[ing] the harms in [a] meaningful way to the information withheld,'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (third alteration in original) (quoting *Judicial Watch, Inc. v. Dep't of Justice* ("*Judicial Watch II*"), Civ. A. No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019)); *see also* H.R. Rep. No. 114-391, at 9 (2016) ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.").  Agencies therefore "must provide more than 'nearly identical boilerplate

statements' and 'generic and nebulous articulations of harm.'"  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting *Judicial Watch II*, 2019 WL 4644029, at *4–5).

Of course, the agency's burden to demonstrate that harm would result from disclosure may shift depending on the nature of the interests protected by the specific exemption with respect to which a claim of foreseeable harm is made.  *See, e.g.*, *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020) ("The degree of detail necessary to substantiate a claim of foreseeable harm is context-specific."); S. Rep. No. 114-4, at 8 (2015) (anticipating that foreseeable harm determinations would turn on "whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interest protected by the applicable exemption").  The purpose of the attorney-client privilege encompassed by Exemption 5, for example, is to provide an "assurance of confidentiality" to clients, *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116, 130 (D.D.C. 2019) (internal quotation marks and citation omitted), such that disclosure of privileged information is a harm in and of itself.  When invoking the attorney-client privilege, then, an agency likely does not need to reach far beyond the fact of disclosure to show foreseeable harm. By contrast, foreseeable harm under the deliberative process privilege requires the withholding agency to show more.  The agency "cannot simply rely on generalized assertions that disclosure could chill deliberations."  *Machado Amadis*, 971 F.3d at 371 (internal quotation marks omitted). Rather, the agency must "provide 'context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure.'"  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107 (quoting *Judicial Watch II*, 2019 WL 4644029, at *5).

If an agency fails to show that a withheld record fits within the claimed exemption in the first instance, the foreseeable harm analysis need not be addressed.  *See Machado Amadis*, 971 F.3d at 370.  Thus, EPA's assertions of foreseeable harm are considered only with respect to the internal briefing documents discussed *supra* Part III.B.1.a (Bates Nos. 04639, 05410, 05438); the July 11, 2018 calendar entry containing "preparation notes for an upcoming meeting between Administrator Wheeler and Australian Minister [of Environment and Energy] Josh Frydenberg," *Vaughn* Index at 7; the "Key Messages" and "Background" sections of an internal briefing document about the same meeting (Bates No. 17459), discussed *supra* Part III.B.1.b; and three partially or fully withheld records that plaintiff challenges only on segregability and foreseeable harm grounds (one July 5, 2018 calendar entry, *see Vaughn* Index at 6, and two calendar attachments with Bates Nos. 17566 and 17637, *see id.* at 17–18), *see supra* n.4; Wilcox Decl. ¶ 42.

EPA asserts the deliberative process privilege with respect to all of these withholdings. The D.C. Circuit recently considered the adequacy of an agency's foreseeable harm showing under the deliberative process privilege in *Machado Amadis*.  In that case, the agency's affidavit, submitted in support of its deliberative-process redactions from the contested "Blitz Forms," *see supra* Part III.B.1.b.ii, stated that the withheld material revealed "line attorneys' evaluations, recommendations, discussions, and analysis which are prepared for senior-level review and decisionmaking," *Machado Amadis*, 971 F.3d at 370 (internal quotation marks omitted), and claimed that disclosure of this information "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals," *id.* at 371 (alteration and internal quotation marks omitted).  The D.C. Circuit found this showing of

foreseeable harm sufficient because the agency "specifically focused on the information at issue" and properly "concluded that disclosure of that information would chill future internal discussions."  *Id.* (internal quotation marks omitted).

EPA's *Vaughn* Index in this case makes a similarly adequate showing.  As in *Machado Amadis*, EPA identifies the contents of the documents with sufficient particularity.  *See Vaughn* Index at 6, 7, 10, 12, 13, 14, 17,18, 29; *supra* Part III.B.1.  The agency affirmatively concludes, with respect to each record, that disclosure would harm an interest protected by the privilege. *See Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1, 18–19 (D.D.C. 2019) (summarizing the relevant interests as (1) "protect[ing] creative debate and candid consideration of alternatives within an agency, and, thereby, improv[ing] the quality of agency policy decisions," (2) "protect[ing] the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon," and (3) "protect[ing] the integrity of the decision-making process itself by confirming that officials would be judged by what they decided, not for matters they considered before making up their minds" (internal quotation marks and citations omitted)).  EPA states that disclosure of the withheld information "would hamper the efficient day-to-day workings of EPA," *Vaughn* Index at 10, by "hav[ing] a chilling effect on the Agency's ability to engage in open and frank discussions concerning . . . recommendations to EPA senior leadership" on the particular topic or type of decision at issue, *Vaughn* Index at 6; *see also, e.g.*, *id.* at 7, 10, 12 (disclosure would "impair agency staff's ability to brief issues with candor and provide advice and options to senior level decisionmakers"), 13, 14, 17, 18.  For some of the records, EPA submits that release would generate "public confusion" concerning the agency's final decision.  *See, e.g. id.* at 7, 10, 13, 14,

17, 18.  These predicted results of disclosure are "exactly what the privilege seeks to prevent." *Machado Amadis*, 971 F.3d at 371.

Like the declarations found sufficient in *Machado Amadis*, EPA also draws a sufficient link between these specified harms and "specific information contained in the material withheld." *Judicial Watch II*, 2019 WL 4644029, at *4 (internal quotation marks and citation omitted).  Take, for example, EPA's *Vaughn* Index entry for one of the contested records, a two-page "internal draft briefing document" that "identifies . . . a citizen science-related issue" and provides a "'proposed response' or proposed Agency action related to the identified issue." *Vaughn* Index at 18.  EPA withheld the proposed responses and agency actions, which it states "do[] not reflect an official Agency decision or policy," consist of "analysis, suggestions and proposals on the identified citizen science issues," and were drafted by EPA staff to "brief Administrator Wheeler and other senior leaders on these near-term citizen science-related issues and plans so as to facilitate decision-making." *Id.*  As to foreseeable harm, the agency explains that "disclosure would constrain EPA's ability to perform its basic functions, as staff would no longer feel free to identify issues and propose to senior decision-makers solutions to address those issues" and that "release could cause public confusion by disclosing the thoughts and analysis expressed in the briefing document," as compared to actions actually taken by EPA on the identified citizen science-related issues.  *Id.*  This explanation "specifically connects disclosure of [the record] to a tangible chilling effect," here among EPA staff when drafting options to resolve issues for senior officials' consideration, and a concrete risk of generating public confusion. *Judicial Watch, Inc. v. Dep't of Justice*, Civ. A. No. 17-0832 (CKK), 2020 WL 5593930, at *5 (D.D.C. Sept. 18, 2020) (finding a similar level of detail sufficient in light of *Machado Amadis*).  EPA provides similarly specific explanations of "*why* the disclosure of [a]

particular [record] would implicate the specific harms identified" for each of the challenged records. *Id.* at *4; *see Vaughn* Index at 6, 7, 10, 12, 13, 14, 17,18. The standard of *Machado Amadis* appears to require nothing more.

EPA has sufficiently connected disclosure of the withheld information in these records to a foreseeable harm and has therefore fully justified this subset of its deliberative process withholdings under Exemption 5.

### D.  Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b). Producing segregable information is essential for agencies' FOIA compliance, and "district courts cannot approve withholding exempt documents 'without making an express finding on segregability.'" *Machado Amadis*, 971 F.3d at 371 (quoting *Morley*, 508 F.3d at 1123); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (internal quotation marks and citation omitted)); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117. Even under that presumption, "the agency must provide a 'detailed justification' for [the exempt material's] non-segregability," but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). Affidavits attesting to the agency's "line-by-line review of each document withheld in

full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice. *Id.* (internal quotation marks omitted); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").[14]

To this end, EPA has averred that "all of the information withheld was carefully reviewed to ensure that the Agency has disclosed all reasonably segregable non-exempt information" and that EPA "provided supplemental releases of information where possible." White Decl. ¶ 68. Corroborating these statements is the fact that of the disputed records for which EPA has justified its withholdings or for which plaintiff does not contest EPA's withholdings, all but one was released with redactions. *See Vaughn* Index at 6, 7, 10, 12, 13, 14, 17, 18, 29. Further, EPA's declaration states that "[t]the remaining withheld information, if released, would reveal the information sought to be protected by the exemptions claimed," White Decl. ¶ 68, and its *Vaughn* Index represents, for each of the contested documents, that any potentially non-exempt factual information is "inextricably intertwined" with privileged information, *see Vaughn* Index at 6, 7, 11, 13, 15, 17, 18–19, 29. *See, e.g.*, *Ctr. for Biological Diversity*, 369 F. Supp. 3d at 26 (relying on similar "inextricably intertwined" language in EPA's declarations to find non-segregability). Therefore, EPA's declaration and *Vaughn* Index are sufficient to establish non-

---

[14] The FOIA Improvement Act of 2016 added another provision concerning segregability: "An agency shall . . . (I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and (II) take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). The D.C. Circuit has interpreted subsection (b) of FOIA to be satisfied by affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions." *Johnson*, 310 F.3d at 776 (internal quotation marks omitted). The FOIA Improvement Act's new provision on segregability "appears to require no more than that." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 115.

segregability of the disputed exempt records.  Summary judgment as to these records is granted

for defendant.

## IV.    CONCLUSION

For the foregoing reasons, EPA's Motion for Summary Judgment, ECF No. 19, is granted

in part and denied in part.  EPA is granted summary judgment on Count III as to the adequacy of

its search and partial summary judgment on Count II with respect to certain of its withholdings

under Exemption 5's deliberative process privilege.  These withholdings include all withholdings

from three briefing documents attached to calendar entries (Bates Nos. 04639, 05410, and

05438); a July 11, 2018 calendar entry containing information about Administrator Wheeler's

meeting with Minister Frydenberg (*Vaughn* Index at 7); and the redaction of the "Key Messages"

and "Background" sections from the briefing document with Bates No. 17459, as well as

withholdings from the records contested by plaintiff only with respect to segregability and

foreseeable harm (a July 5, 2018 calendar entry, *Vaughn* Index at 6; calendar attachments with

Bates Nos. 17566 and 17637; and a four-page internal briefing document, *Vaughn* Index at 29).

As for EPA's withholdings under Exemption 5 from the NEC meeting agenda (Bates No.

17471), the agency must either produce the withheld information or supplement its *Vaughn*

Index and/or declarations consistent with this Memorandum Opinion.

Plaintiff's Cross-Motion for Summary Judgment, ECF No. 20, is granted in part and

denied in part.  Plaintiff is granted partial summary judgment on Count II with respect to EPA's

withholdings under Exemption 5's deliberative process privilege of talking points and related

information in the calendar attachments discussed *supra* Part III.B.1.b.iii (Bates Nos. 05385,

17459, 17552, 17727, 17816, 17838, 17919, and 17961) and as to EPA's withholding of

information pursuant to Exemptions 6, 7(C), and 7(E).  EPA must produce all such records consistent with this Memorandum Opinion.  Plaintiff is otherwise denied summary judgment.

The parties are directed to submit, by March 12, 2021, a joint status report as to the progress, if any, the parties have made to narrow the remaining disputed issues and to propose a schedule to govern further proceedings in this matter.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 13, 2021

_____
BERYL A. HOWELL
Chief Judge